UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **CHARLES GRAHAM aka CHARLES STEVENSON and RUSSELL L. DAVIS,** on behalf of themselves and all others similarly situated**,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **TONY C. PARKER, Commissioner, Tennessee Department of Corrections; DR. MARINA CADRECHE, Assistant Commissioner of Rehabilitative Services, Tennessee Department of Corrections; and DR. KENNETH WILLIAMS, Medical Director, Tennessee Department of Corrections,** in their official capacities**,** <br><br> **Defendants.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 3:16-CV-1954 <br><br> Judge Crenshaw <br> Magistrate Judge Brown |

## AMENDED MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Charles Graham aka Charles Stevenson and Russell Davis ("Named Plaintiffs" or "Plaintiffs"), by their undersigned counsel, hereby submit this Memorandum in Support of their Motion for Summary Judgment as to all counts asserted in the Complaint, Docket Entry 1,[1]

---

[1] Plaintiffs originally filed their Motion for Summary Judgment, Dkt. No. 77, and Memorandum in Support, Dkt. No. 78, along with supporting documents, on June 30, 2018. On the eve of that filing, Defendants made a supplemental document production, which documents were, in part, the subject of a hearing conducted by the Magistrate Judge on July 2, 2018 on Plaintiffs' discovery disputes and Motion for Sanctions. *See* Dkt. No. 83. As per the joint order on Plaintiffs' Motion, the Plaintiffs are to file a revised Motion for Summary Judgment on or before July 13, 2018 which reflects updated figures contained in the TACHH minutes produced by Defendants on June 29, 2018. *See* forthcoming Order on Plaintiffs' Motion for Sanctions. As per that Order, Plaintiffs hereby re-file their Motion for Summary Judgment and supporting documents, which have been revised only to reflect the total numbers of inmates considered by

against Defendants Tony C. Parker, Commissioner, Tennessee Department of Corrections, Dr. Marina Cadreche, Assistant Commissioner of Rehabilitative Services, Tennessee Department of Corrections, and Dr. Kenneth Williams, Medical Director, Tennessee Department of Corrections, in their official capacities (collectively "Defendants").

## FACTUAL BACKGROUND

### Hepatitis C and its Treatment

Hepatitis C is a serious, highly infectious disease that is ultimately fatal. Plaintiffs' Amended Statement of Undisputed Material Facts ("Stmt") ¶¶ 1, 3. Infection can be acute or chronic. After the initial six months of infection, most acute cases (75% to 85%) will become chronic Hepatitis C, a lifelong illness. **Dkt. 80-1**, ¶11. More people die from chronic hepatitis C in the U.S. than any other virus, including HIV. HCV Guidance, Dkt. 1-1, p. 3. In the correctional setting, the Hepatitis C virus ("HCV") is a "silent epidemic." HCV Guidance, Dkt. 1-1, p. 1.

Chronic Hepatitis C infection can cause myriad symptoms, including fatigue, jaundice, joint and muscle pain, leg and abdominal swelling, rectal bleeding, diabetes, and cognitive dysfunction (hepatic encephalopathy). Stmt ¶ 2. If left untreated, chronic Hepatitis C significantly increases the risk of liver cirrhosis, liver cancer, and death. Stmt ¶ 3 ("[I]ndividuals with severe fibrosis, F3 and F4, are at greater risk of liver related outcomes, decompensated cirrhosis, hepatocellular carcinoma, liver transplant, and death from liver disease.").

In the past, standard treatment for infections involved injections of a drug called interferon, which activates the immune system. Stmt ¶ 4. However, that treatment process was

---

the TACHH for treatment between January and June 2018, as reflected in the meeting minutes that were late produced on June 29, 2018.

long, resulted in a low cure rate, and caused intolerable side effects. In 2011, the Federal Drug Administration ("FDA") approved new direct-acting antiviral drugs ("DAAs") to treat HCV. DAAs have few side effects, have greater efficacy than older treatments for HCV, and can be taken for significantly less time (75% less) than prior HCV treatments. *Id*.; **Dkt. 80-4** at p. 151. Treatment with DAAs is the current standard of care. Stmt ¶ 4.

In light of the recent advent of DAAs, medical associations, professional societies, governmental agencies and other entities have recently begun to switch from interferon-based treatment to DAA-based treatment. In fact, the subject matter of this lawsuit is the Tennessee Department of Corrections' ("TDOC") conversion to the current standard of care. Plaintiffs' medical expert advocates, in his testimony, for universal treatment of all HCV-positive inmates. Defendants' medical experts advocate for treatment only for those individuals nearing end-stage liver disease. The parties agree, however, that nearly every federal agency and professional society has adopted universal treatment: the National Academies of Sciences, Engineering, and Medicine; the Centers for Disease Control; Medicare; the U.S. Veterans Administration; etc. *See* **Dkt. 80-4** at 120:10-12 (noting that the CDC and a "long list of organizations" have announced universal treatment as the standard of care), 121:12-25.

**The Plaintiffs**

Plaintiff Russell L. Davis is an inmate in TDOC's Northwest Correctional Complex in Tiptonville, Tennessee. He was diagnosed with chronic HCV in 2009 after complaining of gastrointestinal pain, diarrhea, loss of appetite and weight loss, when he was an inmate in another TDOC facility. Compl. ¶ 4; **Dkt. 75, Exhibit 7**. By 2017, he had progressed to fibrosis stage 4.[2]

---

[2] Medical experts often measure the progression of an HCV-positive individual's liver disease using a 5-point numbering system that indicates liver fibrosis or scarring. Fibrosis level zero (F0) is no scarring, and fibrosis level four (F4) is the most scarring, representing cirrhosis of the

**Dkt. 75, Exhibit 7** (medical chart notes). Despite his advanced staging and expressed symptoms such as pain and leg swelling, Defendants denied him treatment in 2017. *Id.* (meeting minutes).

Plaintiff Charles Stevenson[3] was an inmate at TDOC's Hardeman County Correctional Facility in Whiteville, Tennessee. He was diagnosed with HCV in 2005 while an inmate in another Department facility. Compl. ¶ 5. Defendants never assessed his fibrosis score or considered him for treatment. Amended Declaration of Karla Campbell ("Campbell Decl."), ¶ 3.

### TDOC's Hepatitis C Treatment Policy and Practices

Defendant Williams is the Director of Medical Services at TDOC, a position he has held since 2012. Stmt 7. Currently, Williams also serves as TDOC's Chief Medical Officer and Director of Pharmacy. *Id.* Williams is responsible for developing TDOC policy and protocols regarding diagnosis and treatment of inmates with HCV. *Id.*

Defendants first created the TDOC Chronic HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C ("HCV Guidance") in 2014. The latest version of the HCV Guidance was adopted by TDOC in January 2016 and remains in effect today. Dkt. 1-1. The HCV Guidance is TDOC's official policy governing the diagnosis and treatment of HCV. As established in the HCV Guidance, Defendants created the TDOC Advisory Committee on HIV and Viral Hepatitis Prevention and Treatment ("TACHH").

The HCV Guidance instructs medical providers on site in the prisons only to monitor HCV-positive inmates until their liver scarring reaches a fairly high level, F3. Stmt ¶ 10. At that point, medical providers are to refer these inmates' medical files to the TACHH, at which

---

liver. **Dkt. 80-1**, ¶ 11.

[3] Plaintiff's legal name is Charles Graham. However, his name appears as Charles Stevenson in most of the Department's internal documentation. For ease of reference, Plaintiff will refer to himself as "Charles Stevenson."

point TACHH will determine whether the inmate should be treated. Only TACHH, not the medical providers in prisons, can prescribe DAAs to inmates. *Id.*

Defendant Williams serves as the chair of TACHH and Dr. Asher Turney, the Medical Director of Centurion Healthcare, is the co-chair. Stmt ¶ 8. They have selected a small group of additional medical providers to serve on the committee. *Id.* Defendant Williams states that the policy of TACHH is to meet bi-monthly, **Dkt. 80-3** at 115:21-23 ("We try to meet twice a month"); however, in practice, the TACHH typically meets no more than once per month. Campbell Decl. ¶ 3. TACHH considers an average of 19 inmates for treatment per meeting. *Id.*

## PROCEDURAL BACKGROUND

On July 25, 2016, Plaintiffs brought this suit on behalf of themselves and a class of HCV-positive TDOC inmates to enjoin Defendants from denying medically necessary treatment to inmates infected with the Hepatitis C virus, in deliberate indifference to the suffering of Plaintiffs and the putative Class and in violation of their right to be free of cruel and unusual punishments as guaranteed by the U.S. Constitution. Dkt. 1.

On May 4, 2017, this Court certified the class as follows:

> All persons currently incarcerated in any facility under the supervision or control of the Tennessee Department of Corrections or persons incarcerated in a public or privately owned facility for whom the Tennessee Department of Corrections has ultimate responsibility for their medical care and who have at least 90 days or more remaining to serve on their sentences and are either currently diagnosed with Hepatitis C infection or are determined to have Hepatitis C after a screening test has been administered by the Department of Corrections.

Dkt. 33 (hereinafter the "Class"). Defendants did not file a motion to dismiss or to decertify. *See* Dkt. 34 (setting deadline to file motion to decertify). All motion practice before the Court to date has been discovery-related.

# ARGUMENT

## I. LEGAL STANDARD

### A. Standard of Review

The Court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

"[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus.Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a party makes a properly supported motion for summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [his] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).
In this case, summary judgment is appropriate. The record does not reflect any disputes of material fact, and those undisputed material facts entitle Plaintiffs and Class members to judgment as a matter of law.

### B. Eighth Amendment Standard

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court has construed that

proscription to apply not only to punishments that are "specifically part of the sentence," but also to those "suffered during imprisonment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (citing *Estelle v. Gamble,* 429 U.S. 97 (1976)). Thus, "[t]he Amendment [] imposes duties on [prison] officials," including, among other things, the duty to "ensure that inmates receive adequate . . . medical care . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Eighth Amendment applies to the States through the Fourteenth Amendment of the U.S. Constitution. *Seiter* at 296 (citing *Robinson v. California,* 370 U.S. 660, 666 (1962)).

In the context of medical care, an Eighth Amendment violation is shown by "deliberate indifference to serious medical needs of prisoners." *Estelle,* 429 U.S. at 104; *see also Seiter*, 501 U.S. at 297 ("[A] prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs.") (quoting *Estelle*). The Sixth Circuit has held that this standard encompasses both an objective element and a subjective element. First, the prisoner must show the existence of "a sufficiently serious medical need." *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010) (citation omitted). Severity of a medical need is judged objectively by what would be obvious to a layperson. *Id*. (citing *Blackmore v. Kalamazoo County,* 390 F.3d 890, 897 (6th Cir. 2004)).

Second, "the inmate must demonstrate that the official acted with deliberate indifference to inmate health or safety." *Id*. Deliberate indifference is judged subjectively by showing a knowing disregard for the risks posed to the inmate by his serious medical need. *Id*. (citing *Farmer*, 511 U.S. at 837). To be deliberately indifferent, "an official need not have acted for the very purpose of causing harm or with knowledge that harm will result." *Id*. Rather, the deliberate indifference standard is "equivalent" to reckless disregard. *Farmer* at 836.

7

{005144/16221/00452375.DOCX / Ver.2}
Case 3:16-cv-01954  Document 93  Filed 07/13/18  Page 7 of 19 PageID #: 1073

As explained herein, chronic Hepatitis C is a serious medical condition, and Defendants, by both their policies and practices, simply refuse to treat the vast majority of Class members suffering from this ultimately fatal infection. Summary judgment for Plaintiffs should enter.

## II. DEFENDANTS' UNDISPUTED POLICIES AND PRACTICES VIOLATE THE EIGHTH AMENDMENT

### A. Class Members Suffer from a Serious Medical Need

Hepatitis C infection is a serious condition. In fact, it is ultimately fatal. Stmt ¶¶ 1, 3. As a serious medical condition, Hepatitis C often leads to "serious medical need" for treatment. *See Coleman–Bey v. United States,* 512 F.Supp.2d 44, 47 (D.D.C. 2007) ("[C]hronic Hepatitis C infection presents a serious medical need as the condition may lead to liver disease, including cirrhosis."); *Pabon v. Wright*, 459 F.3d 241 (2d Cir. 2006); *Black v. Alabama Dep't of Corr.*, 578 F. App'x 794, 795 (11th Cir. 2014) ("[C]hronic infection can lead to liver damage, cirrhosis, liver cancer, and liver failure. The parties do not dispute that Black's Hepatitis C is a serious medical need."); *Owens v. Hutchinson*, 79 F. App'x 159, 161 (6th Cir. 2003) ("Owens has adequately alleged that he suffered from an objectively serious medical condition - hepatitis C virus."); *Outlaw v. Ridley-Turner*, 54 F. App'x 229 (7th Cir. 2002).

The Sixth Circuit has adopted the "obviousness standard" for judging objectively serious medical need. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896-98 (6th Cir. 2004). Under that standard, "a medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. at 897 (citation omitted). In this case, the medical needs of Class members are patently obvious.[4]

---

[4] The first prong of the obviousness standard cannot be applied to this case because Defendants do not allow their physicians in the prisons to diagnose and treat inmates/patients with Hepatitis

A medical need is most obvious, even to a layperson, when it is "one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996); *cf Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) (stating that an "obvious need" is one that "expose[s the inmate] to undue suffering or the threat of tangible residual injury"). In this case, Defendants know of 56 inmates who have died between 2013 and 2017 from HCV-related complications. *See* **Dkt. 75, Exhibit 8**. Countless others die each year from HCV whose deaths are not accounted for. *See, e.g.*, **Dkt. 75, Exhibit 11**. By Defendants' count, there are currently 4,210 Class members living with HCV, and only 7 of those are currently receiving antiretroviral treatment. Campbell Decl. ¶ 4. The remaining 4,203 Class members receive no treatment but live with symptoms such as pain, swelling, bleeding, fatigue, and cognitive impairment. Stmt ¶ 2. Hepatitis C is a degenerative disease, and so even during asymptomatic periods, the individual's viral load increases exponentially, which causes progressive scarring of the liver. Eventually, HCV causes cirrhosis, hepatic cancer, and death. Stmt ¶ 3. It is not surprising, then, that other courts recently considering systematic denial of treatment have easily found Hepatitis C to create a serious medical need. *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017) ("Nor should it be surprising that this Court finds chronic HCV to be a serious medical need.").

B.   **Defendants Are Deliberately Indifferent to Class Members' Medical Needs**

Once a serious medical need is found, a prison official becomes liable under the Eighth Amendment when he "knows of and disregards" that need. *Farmer v. Brennan*, 511 U.S. at 837.

---

C. Indeed that failure is the very gravamen of this case – *see* Section II.C.i *infra*. Class members' HCV infection has never been "diagnosed by a physician as mandating treatment" precisely because the Department's policy takes away the ability of medical providers to diagnose and prescribe treatment to inmates for their Hepatitis C. Instead, Defendants interrupt the doctor-patient relationship when Class members reach fibrosis stage 2 and thereafter ration treatment for class members based on cost, not on medical need. This is the only medical condition for which Defendants' do not allow their own doctors to diagnose and treat inmates. *See* **Dkt. 80-5** at 71:19-25.

Knowing disregard is "a state of mind more blameworthy than negligence." *Id*. at 835. However, "[o]fficials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain." *Horn by Parks v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). "[I]t is enough for the prisoner to show that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 436 (6th Cir. 2001) (quoting *Farmer* at 842).

In this case, Defendants are deliberately indifferent to Class members' suffering, degeneration, and death from Hepatitis C. The undisputed evidence demonstrates that Defendants have intimate knowledge of the medical needs of Plaintiffs and Class members. First, Defendants are aware of Plaintiffs and Class members' *diagnosis*, as they maintain in the regular course of business a list of all inmates in the State infected with HCV. Campbell Decl. ¶ 4. Plaintiff Davis appears on that list as do 4,202 Class members (510 women, 3,702 men). *Id*.

Second, Defendants are aware of Plaintiffs and Class members' *need* for treatment. Defendants meet in committee once a month to "review the medical records of patients . . . who are infected with chronic hepatitis C to determine the course of treatment that their medical needs require." Declaration of Kenneth Williams, Dkt. 67 ("Williams Decl."), at ¶ 3. Thus, Defendants regularly review the medical records of Class members, familiarizing themselves with Class members' symptoms and degeneration on account of their HCV. Since the TACHH started meeting, Defendants have reviewed the medical records of 536 Class members, including Plaintiff Davis who was assessed by the committee in January 2017. **Dkt. 75, Exhibit 7**.

In fact, this in-committee review goes to the heart not just of Defendants' awareness of Class members' needs, but also their gross indifference to those needs. There are more than 4,000 known cases of HCV in the TDOC system. Every year, prison medical providers refer

some unknown number of those inmates to the TACHH for treatment. However, the TACHH only reviews an average of 20 individual files per month. Campbell Decl. ¶ 3. The TACHH spends on average only 3 minutes reviewing an inmate's medical records before deciding whether or not that person will receive treatment. *See* **Dkt. 75, Exhibit 7** (showing 1-hour meetings).

The result is that, on average, only 96 of the 4,000+ known cases of HCV are approved for treatment in a year. Campbell Decl. ¶ 3. In reality, far fewer actually receive treatment. While the TACHH "recommends" some inmates for treatment, not all of those recommended actually receive treatment. Some inmates die before receiving treatment. **Dkt. 75, Exhibit 9**. Others never receive it for unexplained reasons. However, no more than 33 inmates receive treatment, because TDOC has annual funding to purchase this limited amount of DAAs. **Dkt. 76, Exhibit 12**.

If only 33 receive treatment per year, that means that 4,177 known cases are left untreated. Countless inmates, whose treating physicians in the prisons have diagnosed and referred them to the TACHH for treatment, do not even make it to the TACHH's meeting agenda. Of the 536 inmates who have actually been considered by the Committee since 2015, 328 have been specifically denied treatment by the Committee. Campbell Decl., ¶ 3. Because the TACHH is the only person or entity with the authority to prescribe DAAs inmates, none of these individuals will receive treatment for their illness. Those inmates referred to the TACHH and also those inmates who the TACHH considers but rejects for treatment all qualify for treatment under the HCV Guidance, TDOC's current treatment policy, and all suffer from advanced stages of liver disease. Thus, the undisputed facts show that Defendants "consciously

disregard a substantial risk of serious harm" to hundreds if not thousands of inmates in their custody every year. *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994).

Just how substantial that risk of harm is cannot be understated. Defendants acknowledge an average of 11 HCV-related deaths per year (11 in 2013, 11 in 2014, 14 in 2015, 11 in 2016, and 9 in partial count 2017). **Dkt. 75, Exhibit 8**. However, their own records show that this figure is a gross underestimate of the true death toll. A sampling of medical records just from two prison facilities, DeBerry Special Needs Facility and Hardeman County Correctional Facility, shows 13 deaths in 2016 and 2017 attributable to HCV. Of those 13 cases, only 2 had been referred to the TACHH. [Only 1 of those 2 was recommended for treatment, in July 2016]. In other words, 11 of those 13 individuals who ultimately died from HCV ever had a chance of receiving treatment. *See* Section II, C, ii; **Dkt. 75, Exhibit 10**.

### C. Defendants' Deliberate Indifference is the Result of Both its Unconstitutional Policy and Unconstitutional Practice

#### i. Defendants' HCV Treatment Policy Is Unconstitutional

A governmental entity violates the Eighth Amendment "where its policies are the moving force behind the constitutional violation." *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) (quoting *City of Canton v. Harris,* 489 U.S. 378 (1989)). When the entity's deliberate indifference is the result of a policy that applies to the plaintiff as a member of the class, class-wide relief is appropriate. *See Sharpe v. Cureton*, 319 F.3d 259, 268–69 (6th Cir. 2003).

In this case, the Department adopted the HCV Guidance as the policy governing Hepatitis C treatment in January 2016, and that policy is still in effect today. Stmt ¶ 9. That policy requires medical providers in the State's fourteen prisons to monitor inmates with HCV until they reach fibrosis stage 3, and then refer those inmates to the TACHH for treatment

determinations. Only the TACHH has the authority to prescribe DAAs; medical staff in the prisons cannot treat patients with medications.

The TACHH does not consult with the treating physicians or other prison medical staff, nor does the TACHH talk to or examine the inmate/patient. **Dkt. 80-5** at 70:6-13. The TACHH's consideration of an inmate's medical needs consists of a brief review of the inmate's medical records and a group discussion, which combined last less than 3 minutes per inmate. This review usually happens once per month, with an average of 19 inmates considered per meeting. In other words, Defendants' official HCV treatment policy permits the consideration of treatment for an average of 228 inmates per year, with only a small fraction of those actually receiving treatment. Because the TACHH does not have the capacity to review more cases than that, the remaining 4,000+ known inmates with HCV have no possibility of even being considered for treatment, regardless of what symptoms they might suffer or how quickly their disease progresses. Because of budgetary constraints, the vast majority of the inmates reviewed by the Committee are not treated. **Dkt. 76, Exhibit 12**. The HCV Guidance simply sets out priority levels for treating the sickest HCV patients first given those budget constraints. Dkt. 1-1, p. 10.

Of course, if the goal of the policy is to prioritize or stage treatment, in light of the "silent epidemic" of HCV in the correctional setting, *id*., p. 1, beginning with the sickest individuals, then the very existence of the TACHH works only to thwart that goal by breaking the doctor-patient relationship precisely at the point in which Class members most need medical care. Rather than being poorly designed, however, the true goal of the policy is much more sinister.

> Q. Can you tell me what, in your opinion, the purpose of the TACHH committee is?
> A. I believe -- well, you want the honest answer? The purpose of the TACHH committee is to spread liability -- to spread liability.

**Dkt. 80-5** at 50:25-51:04.

Thus, Plaintiffs do not merely challenge the adequacy of medical care they receive, but more fundamentally challenge Defendants' policy which, by design, withholds medical care from the vast majority of HCV-positive inmates because of cost. More than just denying Class members the medication that cures the disease, Defendants' policy denies Class members access to prison medical staff for examination, diagnosis and treatment of HCV, instead replacing medical judgment with a mechanical file review by non-examining panel members. That conscious decision to deny inmates even *access* to medical care fails to comport with our most basic constitutional standards. *See Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) ("Thus it is that fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury.").

### ii. Defendants' HCV Treatment Practices Are Unconstitutional

Defendants' actual practices with regard to HCV fall far below the already insufficient level of care provided pursuant to the HCV Guidance. While a governmental entity can be liable for Eighth Amendment violations that result from a deliberately indifferent treatment policy, it can also be liable for violations that result from deliberately indifferent practice that establishes a "de facto policy." *Richko v. Wayne Cty., Mich.*, 819 F.3d 907, 922 (6th Cir. 2016), *cert. dismissed,* 138 S. Ct. 34 (2017); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989) (discussing a de facto "policy or custom" arising from ratifying the conduct).

In practice, the TACHH often goes without meeting for long periods of time. As Defendants concede, the TACHH met only one time, in August, in all of 2015. The TACHH did not meet at all between January and April of 2016. It is undisputed that during these long

periods in which the TACHH did not meet, no Class member could have received treatment for Hepatitis C.

Whereas the HCV Guidance sets out priorities for staging treatment of Class members, Defendants in practice do not utilize that staging. Instead,

> *if we can find them*, we're looking for individuals that are -- have decompensated cirrhosis or are -- appear, clinically, to be approaching decompensation. We look for individuals that are co-infected to give them priority, like HIV or hepatitis B. We focus on individuals who, if we have the genotype and we know that they're genotype 3, they also take precedence.

**Dkt. 80-3** at 97:10-17 (emphasis added).

Williams' comment – "if we can find them" – is instructive. Defendants' practice is to limit treatment to the sickest patients – those with the most advanced liver cirrhosis or other debilitating co-infections. However, Defendants rely on a flawed system to locate those sickest inmates. Defendants do not universally test for Hepatitis C in the TDOC system. Even when a Class member is diagnosed with Hepatitis C, he is at the mercy of the medical provider in his prison to complete the substantial paperwork required to make a referral to the TACHH. He is then at the mercy of the TACHH to actually put him on the agenda and consider his case. Neither the medical provider in the prison nor the TACHH members do any follow up after referral to or after determination by the TACHH to verify next steps. In practice, getting treatment depends more on luck than on medical need.

As of March 2017, Defendants had sufficient funding to treat only 33 inmates per year for Hepatitis C. **Dkt. 76, Exhibit 12**. But in no year since the creation of the current policy have 33 inmates actually been treated. Instead, many who fall into Dr. Williams' stated criteria are denied treatment by the Committee for a myriad of reasons:

- Inmate CH[5] has end stage (F4) cirrhosis, which causes him abdominal swelling and substantial pain. The Committee considered him for treatment in February 2017, but denied him treatment because there was "[n]o evidence treatment will extend lifespan."

- Inmate JP had advanced (F3) bridging fibrosis with many septa, but he was denied treatment by the Committee in January 2018 because an ultrasound of his liver had not been conducted.

- Inmate EF has end stage (F4) cirrhosis but has never been considered by the TACHH for treatment.

- Inmate MJ has advanced (F3) bridging fibrosis with many septa, which causes him pain and swelling, but has never been considered by the TACHH for treatment.

- Inmate SV had end stage (F4) cirrhosis with HIV co-infection, but was denied treatment by the Committee in April 2017, despite being at a "[h]igh risk of progression."

- Inmate TC had advanced cirrhosis and was approved for treatment by the TACHH in January 2017, but died in August 2017. He suffered substantial pain and swelling before his death.

- Inmate MV had advanced cirrhosis but was denied treatment by the Committee in April 2017 because of a substance abuse problem.

- Inmate DR suffered from decompensated cirrhosis, which caused him substantial pain and rectal bleeding. In July 2017, the TACHH recommended delaying his treatment in because he "[n]eeds to be stabilized before DAA treatment."

- Inmate JW became symptomatic, suffering pain and fatigue from his HCV. However, he was not referred to the TACHH because he was in segregation.

*See* **Dkt. 75, Exhibit 9**.

Many individuals meeting the unwritten criteria are never "found" and thus do not receive treatment. The following individuals were never considered for treatment by the TACHH and eventually died of complications of Hepatitis C:

- Inmate RF (liver cancer; hepatic encephalopathy; suffered pain and swelling);
- Inmate DK (cancer; hepatic encephalopathy; suffered pain and swelling);
- Inmate TN (hepatic encephalopathy; suffered pain and swelling);
- Inmate CS (suffered pain);
- Inmate TT (hepatic encephalopathy; suffered pain, bleeding, swelling);

---

[5] Plaintiffs use these inmates' initials to protect their privacy and file medical records under seal.

- Inmate EB (liver cancer; hepatic encephalopathy; suffered jaundice, abdominal pain);
- Inmate RB (hepatic encephalopathy; suffered pain);
- Inmate NB (liver cancer, liver cirrhosis, Hepatitis B; suffered pain);
- Inmate TC (liver cirrhosis, pancreatitis, Hepatitis B; hepatic encephalopathy; suffered pain and swelling);
- Inmate SK (bridging fibrosis, hepatic encephalopathy; suffered pain);
- Inmate DM (suffered pain);
- Inmate KM (liver cancer);
- Inmate CS (hepatic encephalopathy).[6]

*See* **Dkt. 75, Exhibit 10**.

Ms. Debbie Powell learned the cruelty of Defendants' practices after her son, MP, contracted HCV in prison. MP died recently after rapid progression of liver fibrosis from Hepatitis C infection. He was never considered by the TACHH for treatment and suffered greatly before his death. Ms. Powell shares her story in the affidavit filed contemporaneously under seal as **Dkt. 75, Exhibit 11**.

### III. PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

"If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief." *Farmer v. Brennan*, 511 U.S. at 846.

> [T]o survive summary judgment, [plaintiff] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*Id*.

In other words, the undisputed facts must demonstrate "a contemporary violation of a nature likely to continue." *Id*. at 845 (quoting *United States v. Oregon State Medical Soc.,* 343 U.S. 326, 333 (1952)). In this case, the undisputed facts show the present infliction of cruel and

---

[6] All of the names listed in bullet points were discovered through a *sampling* of medical records at *only* 2 of the 14 TDOC prisons – DeBerry and Hardeman.

unusual punishment on Class members and the likelihood of continued future infliction. Defendants have treated HCV under the same policy since January 2016. That policy is still in effect today, and Defendants have produced no revisions or drafts to the policy.

Plaintiffs' entitlement to injunctive relief is clear and undisputed. However, fashioning the precise contours of the injunctive relief requested will require the Court to weigh competing expert evidence. For example, Plaintiffs' expert advocates for universal treatment. Defendants' experts advocate for the treatment of only individuals at fibrosis stage 3 or 4, with certain exceptions. After hearing the expert evidence, the Court could adopt either of these approaches or fashion a compromise approach. However, Plaintiffs posit that that inquiry is not appropriate for summary judgment.

## CONCLUSION

For the reasons set forth herein, Plaintiffs, on behalf of themselves and the Class, respectfully ask the Court to **GRANT** the present Motion, finding Defendants liable for the constitutional violations alleged and awarding Plaintiffs and Class members prospective injunctive relief, the precise details of which will be subject to the Court's factfinding subsequent to a future medical evidentiary hearing.

Dated: July 13, 2018

Respectfully submitted,

/s/ Karla M. Campbell
Karla M. Campbell (BPR 27132)
BRANSTETTER, STRANCH
 & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
karlac@bsjfirm.com

Thomas H. Castelli (BPR 24849)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF TENESEEE
P.O. Box 120160
Nashville, Tennessee 37212
Phone: (615) 320-7142
Fax: (615) 691-7219
tcastelli@aclu-tn.org

Elizabeth S. Logsdon (BPR 32066)
DISABILITY RIGHTS TENNESSEE
2 International Plaza, Suite 825
Nashville, Tennessee 37217
Phone: (615) 298-1080
lizl@disabilityrightstn.org

**CERTIFICATE OF SERVICE**

I certify that on July 13, 2018, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and served via the Court's Electronic Filing System to:

Pamela S. Lorch
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202-0207

Steve Hart
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202-0207

Jim Newsom
Tennessee Attorney General's Office
40 South Main Street, Suite 1014
Memphis, TN 38103-1877

*Attorneys for Defendants*

/s/ Karla M. Campbell
Karla M. Campbell