**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CHARLES GRAHAM, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 3:16-cv-01954** |
| | ) | **Chief Judge Waverly D. Crenshaw, Jr.** |
| **v.** | ) | **Magistrate Judge Joe Brown** |
| | ) | |
| **TONY C. PARKER, *et al*.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.01, Tony C. Parker, Commissioner of the Tennessee Department of Corrections (TDOC), Edward J. Welch, TDOC Assistant Commissioner of Rehabilitative Services, and Kenneth L. Williams, M.D., Ph.D., TDOC Medical Director (collectively "Defendants"), by and through the Office of the Tennessee Attorney General, hereby submit the following response in opposition to Plaintiffs'[1] Amended Motion for Summary Judgment (ECF 92). Defendants rely upon their Response to Plaintiffs' Amended Statement of Facts and Defendants' Statement of Additional Material Facts as to Which There Exists a Genuine Issue to Be Tried ("DSAMF") and its supporting materials filed contemporaneously. For the reasons below, the Court should deny Plaintiffs' motion.

---

[1] The claims of the class representatives are moot, as (1) on July 12, 2018, Mr. Russell Davis completed a 12-week course of Epclusa, a direct-acting antiviral agent, and (2) Mr. Charles Stevenson (a/k/a Charles Graham) was paroled on December 14, 2017. DSAMF 66-67; Declaration of Dr. Kenneth Williams,¶¶ 6-7.

# I. STANDARD OF REVIEW

Summary judgment is appropriate where the court is satisfied "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of showing the absence of any such "genuine dispute" rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"[I]f the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Mich. Dept. of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322-23). Only after such an affirmative showing by the moving party does the burden of production shift to the nonmoving party to produce evidence of genuine dispute of material fact for trial. *See McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

The court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but only to determine whether there is a genuine issue of material fact for trial. *Savage v. Federal Express Corp.*, 856 F.3d 440, 446 (6th Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The court must assume the truth of direct evidence submitted by the nonmoving party and must draw all justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255.

# II. ARGUMENT

## A. Only TDOC's Current Practices Are Material

Plaintiffs assert that "Defendants, *by their past and present actions*, have violated Plaintiffs' constitutional right to be free from cruel and unusual punishments." ECF 92 at 2, Page ID# 1064 (emphasis added). In support of that assertion, they cite treatment statistics dating back

2

to January 2015 as evidence of inadequate treatment. ECF 95 at 4, Page ID# 1092, ¶¶ 11-12. But Plaintiffs are not entitled to a declaration concerning the adequacy of Defendants' past actions. *Green v. Mansour*, 474 U.S. 64, 68-69 (1985). The proper inquiry is not whether Defendants acted unconstitutionally in the past, or even during the pendency of this litigation, but whether Defendants' actions are unconstitutional at the time that the Court acts. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969); *Midwest Media Prop., L.L.C. v. Symmes Tp., Ohio*, 503 F.3d 456, 460 (6th Cir. 2007).

The First Circuit opinion in *Lovell v. Brennan*, 728 F.2d 560 (1st Cir. 1984) illustrates this point. In 1978 and 1979, inmates at a state prison in Maine brought three class action lawsuits against state officials seeking to enjoin various conditions of their confinement that allegedly violated the Eighth Amendment. *Id.* at 561. The district court consolidated the cases and held evidentiary hearings in 1979 and 1980. *Id.* at 562. This was followed by a lockdown of the prison and the appointment of a new warden who made substantial improvements to the prison's facilities, staffing, and programs. *Id.* Thereafter, in 1981 and 1982, the court held a second round of evidentiary hearings. *Id.* In 1983, the district court issued an opinion in which it found that current prison conditions were minimally adequate under the Constitution. *Id.*

On appeal, the inmates asserted that the district court's finding that the substantially improved prison conditions were minimally adequate under the Constitution implied that past conditions had been unconstitutional. *Id.* They further asserted that the improvements made under pressure of litigation provided no guarantee that defendants would not allow conditions deteriorate to unconstitutional levels in the future. *Id.* As such, they argued that an injunction would be necessary to prevent future constitutional violations. *Id.*

3

The First Circuit Court of Appeals rejected the inmates' argument and affirmed the district court's judgment. *Id.* at 565. The court explained that the exclusion of pre-lockdown evidence was entirely proper considering the improvements made thereafter and those projected at the time of trial. *Id.* at 563. Additionally, the district court was entitled to presume that state prison authorities would carry on their duties in compliance with the Constitution without further monitoring. *Id.* at 564 (citing *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974) (absent constitutional violations, federal courts should be reluctant to interfere with state prison administration)).

The case at bar presents a similar circumstance. The U.S. Food and Drug Administration approved the use of direct-acting antiviral drugs (DAAs) for the treatment of chronic Hepatitis C (cHCV) in late-2013. ECF 1 at 4, Page ID# 4, ⁋ 13. Though DAAs have fewer side-effects and higher effectiveness in achieving sustained virologic responses than the interferon-based treatment regimens that preceded them, they come at a high cost. DSAMF 4, 64. At one time, a 12-week treatment with DAAs cost TDOC approximately $80,000 per patient. DSAMF 64. Nevertheless, the TDOC Advisory Committee on HIV and Viral Hepatitis Prevention and Treatment (TACHH) began approving cHCV-infected inmates for DAA treatment in 2015. DSAMF 52, 57. Since that time, the price of DAA treatment has dropped considerably in the United States. DSAMF 64. Additionally, TDOC has sought and received increased funding for the treatment of cHCV from the Tennessee Legislature. DSAMF 63. In Fiscal Year 2017-18, the Tennessee Legislature approved and TDOC received a recurring budget allocation of $2 million for the administration of DAA treatment of cHCV. DSUMF 63. Pursuant to contract, TDOC's medical provider matches that sum each year. DSUMF 63. As a result, the rate at which cHCV-infected inmates are approved for DAA treatment has increased dramatically since 2015. DSAMF 15. For instance, of the 219 cHCV-infected inmates that TACHH approved for DAA treatment from January 2015 through

June 2018, 169 (77%) were approved in the most recent Fiscal Year 2017-18 (beginning June 1, 2017) alone. DSAMF 12, 15. Moreover, DAA treatment rates are expected to increase as these trends continue in the future. DSAMF 11, 59, 64, 79.

Despite significant increases in the number of patients approved for DAA treatment in the most recent fiscal year, Plaintiffs rely on treatment statistics dating back to January 2015 as evidence of a present constitutional violation. ECF 95 at 4, Page ID# 1092, ¶¶ 11-12. Such dated information bears no meaningful relation to the adequacy of Defendants' current practices. Defendants therefore respectfully submit that only evidence since the beginning of Fiscal Year 2017-18 (June 1, 2017) should be considered by the Court in measuring the constitutionality adequacy of their practices.

## B. Eighth Amendment Claims for Deliberate Indifference

Section 1983 provides a federal cause of action against government officials who, acting under color of state law, have "deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Plaintiffs assert that Defendants have deprived them of rights secured by the Eighth Amendment by acting with deliberate indifference to their serious medical needs. Defendants do not dispute that they act under color of state law but deny that Plaintiffs have carried their burden to produce credible evidence of a constitutional violation.

The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991). As interpreted by the Supreme Court, the Eighth Amendment requires that punishment for a crime "must not be grossly out of proportion to the severity of the crime" or "involve the unnecessary and wanton infliction of pain."

5

*Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (citations omitted). Nevertheless, "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (internal citations omitted).

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court first acknowledged that the Eighth Amendment "could be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson*, 501 U.S. at 297. Specifically, the Court concluded "that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. But because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment . . . . '[i]t is *only* such indifference' that can violate the Eighth Amendment." *Wilson*, 501 U.S. at 297 (emphasis by the Court) (quoting *Estelle*, 429 U.S. at 104, 106). "[A]llegations of 'inadvertent failure to provide adequate medical care,' or of a 'negligent diagnosis,' simply fail to establish the requisite culpable state of mind." *Id.* (quoting *Estelle*, 429 U.S. at 105-06). "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 298-99 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited" by the Eighth Amendment. *Id.* at 299 (emphasis by the Court) (quoting *Whitley*, 475 U.S. at 319).

Establishing the "requisite culpable state of mind" in an Eighth Amendment medical needs case is necessitated by the text of the amendment itself. *Rhinehart ex rel. Estate of Rhinehart v. Scutt*, 894 F.3d 721, 736 (6th Cir. 2018). Because the provision of medical care for a prisoner is not explicitly part of the sentence imposed, its inadequacy only constitutes a "cruel and unusual

6

punishment" if the government actor, at a minimum, knew the care provided or withheld presented

a serious risk to the inmate and consciously disregarded that risk. *See Wilson*, 501 U.S. at 300 ("If

the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge,

some mental element must be attributed to the inflicting officer before it can qualify."). "An

accident, although it may produce added anguish, is not on that basis alone to be characterized as

wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at 105. The government actor must act

with "deliberate indifference to serious medical needs of prisoners," in order for the alleged

inadequacy of care to be considered "cruel and unusual punishment." *Id.* at 104.

To establish deliberate indifference to a serious medical need an inmate must present

credible evidence that satisfies two components, one objective and the other subjective. *Farmer v.

Brennan*, 511 U.S. 825, 834 (1994). First, the plaintiff must show a deprivation of medical care

that objectively posed a "substantial risk of serious harm." *Id.* Second, the plaintiff must show

that the prison official acted with a "sufficiently culpable state of mind." *Id.* at 839-40. Here,

Plaintiffs have failed to support their motion for summary judgment with sufficient evidence to

satisfy either component.

## 1. Objective Component

The objective component of an Eighth Amendment cruel and unusual punishment analysis

requires the plaintiff to demonstrate a "sufficiently serious" medical need that results in the "denial

of the minimal civilized measure of life's necessities." *Id.* at 834. The Sixth Circuit recognizes two

distinct methods of establishing the objective component of an Eighth Amendment claim. When

an inmate's medical need is "so obvious that even a lay person would easily recognize the necessity

for a doctor's attention," the objective component may be established without medical proof by

simply showing that prison officials delayed or denied treatment. *Blackmore v. Kalamazoo Cnty.*,

390 F.3d 890, 897 (6th Cir. 2004). This stems from the premise that, if the need for medical treatment is so obvious, "the delay alone in providing medical care creates a substantial risk of serious harm." *Id.* at 899.

But inmates who have received some medical attention and challenge the adequacy of their treatment must make a more substantial evidentiary showing. "A desire for additional or different treatment does not by itself suffice to support an Eighth Amendment claim." *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017). "This is particularly the case when a plaintiff fails to provide expert medical testimony–either in the form of an affidavit or through depositions– showing the medical necessity for such a treatment." *Id.* Courts in the Sixth Circuit therefore "distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). When inmates challenge the adequacy of their treatment, they must place verifiable medical evidence in the record showing that the treatment was "so woefully inadequate as to amount to no treatment at all." *Id.* "This will often require 'expert medical testimony showing the medical necessity for' the desired treatment and 'the inadequacy of the treatments' the inmate received." *Rhinehart*, 894 F.3d at 737-38 (quoting *Anthony*, 701 F. App'x at 464).

Plaintiffs' claims fall squarely into the second category, despite their assertion to the contrary. Plaintiffs argue that the obviousness standard should apply because the seriousness of chronic Hepatitis C "is so obvious that even a lay person would easily recognize the necessity of a doctor's attention." ECF 93 at 8, Page ID# 1074. Defendants do not dispute that chronic Hepatitis C is a serious condition that requires medical attention. But "the obviousness standard refers to a doctor's attention, and thus is primarily applicable to claims of denial or delay of *any* medical

8

treatment rather than claims that a plaintiff was denied or delayed in receiving a *specific type* of medical treatment." *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011). Plaintiffs do not assert a denial of a medical attention. Rather, they assert that Defendants, through their policies and practices, deny some members of their class a specific type of treatment–DAA treatment. They have not, however, placed any verifiable medical evidence in the record showing the medical necessity of providing DAA treatment to those individuals. They have therefore failed to satisfy their initial burden of production, and their motion for summary judgment must fail.

Even if Plaintiffs did satisfy their initial burden of production, summary judgment would not be appropriate because there is a genuine dispute of fact concerning existence of an objectively serious medical need. Defendants' medical expert, Ronald L. Koretz, M.D. opines that there is no medical necessity to treat individuals who have lower stages of fibrosis (i.e., F0-F2) unless they have an extenuating circumstance. DSAMF 83. In fact, most of the patients who have lower stages of fibrosis will never progress DSAMF 146. Delaying treatment in such individuals will not create any significant risk to their welfare, so withholding DAAs from this group is a reasonable response to their medical condition. *See* DSAMF 83. Considering Dr. Koretz's testimony, there is, at the very least, a genuine dispute of fact concerning the existence of an objectively serious medical need, which precludes a grant of summary judgment in Plaintiffs' favor.

## 2. Subjective Component

The subjective component of an Eighth Amendment cruel and unusual punishment analysis requires the plaintiff to demonstrate that the defendants acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834, 839-40. Deliberate indifference does not require that the defendants act for the very purpose of causing harm or with knowledge that harm will result, but it does require that they act with more than mere negligence. *Santiago v. Ringle*, 734 F.3d 585,

9

591 (6th Cir. 2013). Thus, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id*. (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). Federal courts have characterized the required mental state as "equivalent to criminal recklessness." *Id.* (citing *Farmer*, 511 U.S. at 834, 839-40). This showing requires the proof that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Darrah v. Krishner*, 865 F.3d 361, 368 (6th Cir. 2017) (citations omitted). The plaintiff must make this showing individually for each defendant. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

Though plaintiffs bear the "onerous burden" of proving prison officials' subjective knowledge, they may rely on circumstantial evidence in doing so. *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 842). The fact-finder may "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. Nevertheless, the plaintiff must present evidence from which the fact finder could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." *Rhinehart*, 894 F.3d at 738 (quoting *Cairelli v. Vakilian*, 80 F. App'x 979, 983 (6th Cir. 2003)). Doctors are not liable under the Eighth Amendment if they provide reasonable treatment, even when the outcome is insufficient or even harmful. *Id*. (citing *Farmer*, 511 U.S. at 844). Because doctors are bound by the Hippocratic Oath, not applicable to other prison officials, the Court should defer to their medical judgment. *Id*. (citing *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018) ("[T]his Court is deferential to the judgments of medical professionals.")). That is not to say that doctors may claim immunity from deliberate-indifference claims simply by providing "some treatment,"

but "there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have 'consciously exposed the patient to an excessive risk of serious harm.'" *Id.* (emphasis by the court) (quoting *Richmond*, 885 F.3d at 840).

## C. Application to Plaintiffs' Claims

Plaintiffs' claims are based on their infection with cHCV. Defendants do not dispute that Plaintiffs, by the class definition, have cHCV or that the condition requires medical care. But the summary judgment record does not demonstrate that Plaintiffs receive constitutionally inadequate treatment or that Defendants possess the mental state necessary for Eighth Amendment liability.

### 1. TDOC Is Not a Defendant

TDOC is an arm of the State of Tennessee for purposes of federal civil rights claims and is therefore not a suable entity under § 1983–either for damages or injunctive relief. *See Hix v. Tenn. Dep't of Corr.*, 196 F. App'x 350, 355 (6th Cir. 2006) (holding that neither the TDOC nor its medical department is a "person" within the meaning of § 1983) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought.")). Plaintiffs nevertheless cite cases in which municipal or county liability was at issue to contend that TDOC, a state governmental entity, has violated the Eighth Amendment. *See, e.g.,* ECF No. 93 at 12, Page ID# 1078 ("A *governmental entity* violates the Eighth Amendment 'where its policies are the moving force behind the constitutional violation.'" (citing *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005)); *id.* at 14, Page ID# 1080 ("While a governmental entity can be liable for Eighth Amendment violations that result from a deliberately indifferent treatment policy, it can also be

11

liable for violations that result from deliberately indifferent practice that establishes a 'de facto policy.'" (citing *Richko v. Wayne Cnty., Mich.,* 819 F.3d 907, 922 (6th Cir. 2016); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989)). By contrast, TDOC is not so subject to suit, either for damages or injunctive relief, and has not been named a defendant, for good reason.

Moreover, Plaintiffs repeatedly ascribe asserted conduct to "the Department," ECF No. 93 at 12, Page ID# 1078 ("the Department adopted the HCV Guidance"); or to TACHH, *id.* at 11, Page ID# 1077 ("However, the TACHH only reviews an average of 20 individual files per month."); *id.* ("The TACHH spends on average only 3 minutes reviewing an inmate's medical records before deciding whether or not that person will receive treatment."). Neither the Department nor the TACHH is so subject to suit, either for damages or injunctive relief, and neither are defendants in this cause against whom declaratory or injunctive relief may be afforded.

### 2. Plaintiffs' Claims Against Defendant TDOC Commissioner Tony C. Parker

As to Plaintiffs' claims against Defendant Parker, Plaintiffs' Amended Statement of Undisputed Material Facts (ECF No. 95) (ASUMF) does not assert any fact demonstrating that Commissioner Parker personally participated in any of the asserted conduct that gives rise to Plaintiffs' claims.[2] In order to establish an Eighth Amendment violation as to a named defendant, a plaintiff must prove personal involvement on the part of the defendant. *See Rizzo v. Goode*, 423 U.S. 362, 371 (1976) (to establish the liability of any individual defendant, the plaintiff must show that the particular defendant was personally involved in the activities giving rise to the plaintiff's claims); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in their

---

[2] "The Court's Local Rule regarding statements of undisputed facts and responses thereto exist for a reason. Such rules 'are meant to ease the district court's onerous task and to prevent parties from unfairly shifting the burdens of litigation to the court.'" *Matthews v. Copeland*, 286 F.Supp.3d 912, 916 (M.D. Tenn. 2017) (citing *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007)). If Plaintiffs assert facts to be material on this motion, LR56.1(a) requires those facts to be explicated in their "statement of the material facts as to which the moving party contends there is no genuine issue for trial." Failure to comply is a ground for denial. *See Jackson v. Star Transport,* No. 3:09-cv-0613, 2010 WL 3724849 (M.D. Tenn. Aug. 26, 2010).

individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior."); *Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) ("Personal involvement is necessary to establish section 1983 liability."). The TDOC Commissioner has no role in issuing the Chronic HCV Guidance, nor is he involved in the decisions of the TACHH, as these are clinical decisions requiring medical judgment. DSAMF 38 & 51. Having failed to demonstrate personal involvement, Plaintiffs fail to support their motion for summary judgment with credible evidence showing that Defendant Parker has acted with deliberate indifference towards Plaintiffs' serious medical needs. Plaintiffs' motion for summary judgment against Defendant Parker must be denied.

### 3. Plaintiffs' Claims Against Defendant TDOC Asst. Com. Dr. Marina Cadreche

Likewise, Plaintiffs' ASUMF (ECF No. 95) does not set forth any facts demonstrating that Dr. Cadreche (or her current successor as TDOC Assistant Commissioner of Rehabilitative Services, Edward J. Welch, who Plaintiffs have not named as a defendant) personally participated in any of the asserted conduct that gives rise to Plaintiffs' claims. Thus, as with Defendant Parker, Plaintiffs fail to support their motion for summary judgment with credible evidence of alleged unconstitutional behavior on the part of Defendant Cadreche. There being no showing that Dr. Cadreche has acted with deliberate indifference towards Plaintiffs' serious medical needs, Plaintiffs' motion for summary judgment against Defendant Cadreche must be denied.

### 4. Plaintiffs' Claims Against Defendant TDOC Medical Director Kenneth L. Williams, M.D., Ph.D.

Plaintiffs' ASUMF asserts as to Dr. Williams (by name): that he is Director of Medical Services, Chief Medical Officer, and Director of Pharmacy at TDOC; that he is responsible for creating and implementing TDOC's HCV treatment protocols; that he, on behalf of TDOC, developed the 2016 HCV Guidance; and that he is Chair of TACHH. ECF No. 95 at 3, Page ID# 1091, ¶¶ 7, 8. These facts are undisputed. Although it is unclear whether Plaintiffs' ASUMF

13

attributes TDOC's response to patient-inmates' cHCV diagnosis and treatment to Dr. Williams' personal involvement, disputed issues of material fact preclude summary judgment against him.

### a. The Class Certification

To place this discussion in context, it is important to note that the Court has certified a plaintiff class. *See* ECF 32, 33. The Court observed that "[i]t is the official policies and practices applicable to all inmates with Hepatitis C which Plaintiffs allege are unconstitutional." ECF 32 at 6, Page ID# 265. "Plaintiffs are not challenging individual courses of treatment; they are challenging Defendants' official protocols and system-wide practices for Hepatitis C diagnosis and treatment…." *Id.* at 7, Page ID# 266. "Plaintiffs are not simply disagreeing with a doctor's course of treatment for a particular person. They are attacking TDOC's state-wide policies and procedures applicable to all inmates with Hepatitis C." *Id.* "In order to obtain the injunctive relief sought, Plaintiffs will have to show that Defendants' practices and procedures for *all* inmates who have Hepatitis C are unconstitutional and that Defendants' practices and procedures for *all* inmates should be revised." *Id.* (emphasis by the Court).

### b. Plaintiffs' Claim Relates to Alleged Inadequate Medical Treatment, Not Denial of Care

In assessing Plaintiffs' claims against Dr. Williams, the Court should keep in mind the distinction "between cases where [there is] a complete denial of medical care and those cases where the claim is that prisoner[s] received inadequate medical treatment." *See Alspaugh*, 643 F.3d at 169 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)). A "disagreement with the testing and treatment [ ] received ... does not rise to the level of an Eighth Amendment violation." *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008) (citing *Estelle*, 429 U.S. at 107). Nor does "a desire for additional or different treatment ... suffice to support an Eighth Amendment claim." *Anthony*, 701 F. App'x at 464.

14

Chronic Hepatitis C is often asymptomatic until the virus begins to cause liver damage, which can take decades to occur. DSAMF 19. Over time, some patients with cHCV develop progressive scarring (called fibrosis) in the liver.[3] DSAMF 17, 24. A 5-point classification system is used to measure the degree of fibrosis, ranging from 0 (no fibrosis) to 4 (cirrhosis). DSAMF 18. It is possible to have cirrhosis and still have normal liver function (referred to as "compensated cirrhosis"). The occurrence of either decompensated cirrhosis (in which liver function is compromised) or hepatocellular carcinoma is referred to as End-Sage Liver Disease (ELSD). DSAMF 22, 23. The primary goal of treatment of cHCV should be the prevention of ESLD. DSAMF 29.

The TDOC Chronic HCV Guidance was developed by Dr. Williams with input from other medical authorities to assist the local area practitioners (many of whom were not trained regarding treatment of cHCV) in addressing the medical needs of the inmates in TDOC facilities through screening, diagnosis, and management of cHCV. Other than the initial assessment, management of cHVC has been centralized in the TACHH since the creation of the initial TDOC Chronic HCV Guidance, which simplifies the steps for local providers. DSAMF 36-37. Although TDOC has not updated its written 2016 Chronic HCV Guidance, TDOC has moved beyond the written guidance in its practices such that parts of the original written guidance not applicable or relevant to its current practice. DSAMF 39-40.

After an initial determination that inmates have cHCV, they are enrolled in the "chronic care clinic," where new lab and other tests are periodically conducted every three to six months. The inmates are also provided education about the disease process and how to avoid behavior that

---

[3] Possibly inflated estimates are that of every 100 people infected with HCV, approximately, 75 to 85 people will develop cHCV; of those with cHCV, 5 to 20 people will develop cirrhosis in a period of 20 to 30 years, and only 1 to 5 people will die from cirrhosis or liver cancer. DSAMF 21.

would likely exacerbate their condition. DSAMF 43-46. TDOC instructs the medical provider at the TDOC facility regarding individuals that have lab results that indicate their cHCV condition warrants closer assessment to refer those inmates to the TACHH at the central office. DSAMF 52.

The TACHH, which began operation in 2015, was established to ensure fair and consistent practice for managing cHCV and HIV. TACHH consists of medical professionals—including a Hepatologist (infectious disease specialist). TACHH currently meets to discuss recommendations for cHCV treatment, to make recommendations and referrals to infectious disease specialists for individual patients, to look for opportunities to improve patient education and improve provider education and skills. TACHH is responsible for the husbandry of resources and managing patients according to their clinical status. DSAMF 50-52.

Plaintiffs' motion does not contest that Dr. Williams has "intimate knowledge of the medical needs of Plaintiffs and class members" and is "aware of Plaintiffs and class members' diagnosis." ECF 93, at 10, Page ID# 1076. Plaintiffs also acknowledge that TACHH meets "in committee once a month . . . to determine the course of treatment that their medical needs require." *Id.* (quoting the Declaration of Dr. Kenneth Williams, ECF No. 67 at ¶ 3). TACHH focuses on how individuals appear clinically, such as if they are approaching decomposition and are having difficulty functioning. TACHH conducts a clinical discussion about each individual patient based upon the lab results and other medical information (supplied by local TDOC facility medical providers). TACHH then makes a collaborative decision as to whether the patient should be referred to the infectious disease group (at Meharry Medical Group) for DAA treatment or should not be referred at that time, but further actively monitored. TACHH also gives instructions for the type of monitoring, which is personalized for the patient.  DSAMF 56-58.

The types of DAAs available changes frequently as new generations become available. TACHH continually adapts to the availability of new DAA treatment regimens, which are often available at lower cost and wider applicability than those regimens that were available just the year before. This is indeed a dynamic process. There have already been at least two, and maybe three, generations of DAAs made available for the treatment of individuals with cHCV. DSAMF 48, 58.

From January 2015 through June 2018, TACHH considered 417 patients for DAA treatment. Plaintiffs incorrectly assume that when TACHH defers DAA treatment, "none of these individuals will receive treatment for their illness. ECF No. 93, Page ID# 1077. That assumption is unfounded. To date, TACHH has considered the cases of 103 patients who were previously deferred for DAA treatment. This progression will continue with future meetings. The number of patients per month considered by TACHH for DAA treatment has also increased. For instance, during Fiscal Year 2017-18 (July 2017 to June 2018), TACHH considered 330 patients for DAA treatment–an average of 27 patients per month. DSAMF 60. Plaintiffs also assert, without support, that of those patients approved for DAA treatment, "far fewer actually receive treatment." ECF No. 93, at 11, Page ID# 1077. In practice, however, approval for DAA treatment is followed by actual administration. DSAMF 60. At June 30, 2018, 136 patients were receiving DAA treatment for treatment of cHCV. DSAMF 61.

Plaintiffs essentially argue that TDOC is deliberately indifferent if it does not immediately provide universal DAA treatment to all inmates with cHCV. But Defendants raise clear issues of disputed material fact regarding the medical necessity of universal treatment. *See* DSAMF 63-78. Moreover, Defendants have established disputed issues of material fact, when principles of evidence-based medicine are applied, regarding the strength and validity of the AASLD/IDSA Guidelines on which Plaintiffs' argument for universal DAA treatment is based. *See* DSAMF 79-

17

165. For example, evidence-based medical principles demonstrate the following weaknesses of the AASLD/IDSA Guideline's recommendation of universal DAA treatment (DSAMF 86): the guidelines confuse association with causation in supporting the effectiveness of DAA treatment, DSAMF 87-101; randomized trials do not show the effect of DAAs on clinical outcomes, DSAMF 101-106; there are evidentiary limitations to the non-randomized studies relied upon by the guidelines, DSAMF 106-112; achieving SVR is a surrogate outcome, which has never been validated, and not at "cure," DSAMF 113-16, 130-38; the guidelines utilize flawed modeling with a bias favoring DAA treatment, DSAMF 117-129; DAA treatment has not been sufficiently proven to improve long-term outcome or to improve the quality of life, DSAMF 139-144, 148-154; and treatment of patients with lower stages of fibrosis has not been shown to be better, DSAMF 145-147. The AASLD/IDSA Guidelines do not meet the standards for trustworthiness set forth in GRADE or by the Institute for Medicine, especially with regard to conflicts of interest their authors have with the pharmaceutical industry. DSAMF 152-170.

Because physicians cannot predict which cHCV patients will progress to ELSD, and there is uncertainty about the long-term liver-related outcomes and harms of DAA treatment, it is clinically sensible and provides medically necessary care to regularly monitor the condition of cHCV patients with no fibrosis or mild fibrosis as treatment and to prescribe DAA treatment only for those with more advanced fibrosis scores (F3 and F4) who are at higher risk of developing ESLD and HCC. DSAMF 67-68.

Defendants' medical experts, Ronald L. Koretz, M.D., and Martha Gerrity, M.D. MPH, PhD., opine that there is no medical necessity to treat individuals who have lower stages of fibrosis (i.e., F0-F2) unless they have an extenuating circumstance. DSAMF 83. In fact, most of the patients who have lower stages of fibrosis will never progress. *See id.* 146. Delaying treatment in

18

such individuals will not create any significant risk to their welfare, so withholding direct-acting agents from this group is a reasonable response to their medical condition. *See id.* 83. There is no evidence that treatment of patients with lower stages of fibrosis is beneficial, and since most of these patients will never develop ESLD (decompensated cirrhosis or hepatocellular carcinoma [HCC]) even if not treated, it is a more rational policy to provide treatment only to those who are at high risk of developing end-stage liver disease, namely those with stage 3 or 4 fibrosis." *See id.* at ¶¶ 73; *see also* DSAMF 16-20, 22-29, 71-78, 80-84, 86-138, 140-171 (providing additional support for the opinions of Dr. Koretz).

The practice of medicine has always required balancing risks and benefits; the risks of the Plaintiffs' request to mandate universal treatment (the small chance of unexpected adverse events and the certain necessary diversion of resources from other medical interventions) far outweigh the alleged benefits which are not supported by adequate medical evidence. *See* DSAMF 83. Dr. Koretz, Dr. Gerrity (also Defendants' medical expert), and Dr. Williams agree that the primary goal of treatment of cHCV should be the prevention of ESLD. Furthermore, if DAA treatment truly prevents further progression, then it should not matter when it is administered, so long as it is provided before any manifestation of ESLD appears. *See id.* 29. All infected patients with lower fibrosis scores can be periodically assessed for their stage of fibrosis. Since it takes years or decades for progression to occur, there is sufficient time to identify those with truly advanced fibrosis (those who do progress to stage 3) before any adverse clinical events occur and then intervene with administration of DAAs. *See id.* 74.

Based on current research evidence, it is clinically sensible and provides medically necessary care to individuals with cHCV and no or mild fibrosis, since physicians cannot predict who will, or will not progress and there is uncertainty about the long-term liver-related outcomes

19

and harms of DAA treatment, to regularly monitor the condition of the patient (engage in "active surveillance") as treatment and to prescribe treatment with DAAs only for those with more advanced fibrosis scores (F3 and F4) who are at higher risk of developing ESLD. *Id.* at ¶¶ 68-69, 74.

The current cost of DAA regimens is high. However, the price of DAAs in the United States is expected to continue to drop as new generations of DAAs become available. Not only is universal treatment of all inmates infected with HCV (including F0s through most F2s) not medically necessary (as set forth herein), but it would be an unwarranted waste of resources as is shown through sample calculations of the costs of treating 4,000 patients with specified DAAs at various prices at which those DAAs have been available to TDOC over time. DSAMF 64-65; *See* Supplemental Declaration of Dr. Williams at ¶¶ 9-10. As explained in *Kietz v. Washington County, Pa.*, No. 2:13cv507, 2014 WL 1316129 (W.D. Pa. Mar. 31, 2014):

> "Resources are not infinite and reasonable allocation of those resources, taking into account cost, does not amount to deliberate indifference even if a prisoner does not receive the most costly treatments or his treatments of choice." *Brightwell v. Lehman*, No. Civ.A. 03–205J, 2006 WL 931702, at *8 (W.D. Pa. April 10, 2006). In this regard, the Court notes that the Eighth Amendment does not require a prison to provide an inmate "with the most sophisticated care money can buy." *United States v. DeCologero*, 821 F.2d 39, 42 (1st Cir.1987). Nor are prison medical officers required to be blind to assessing risks and costs of various treatment options. Furthermore, it is also clear that a dispute regarding whether doctors erred in this cost-benefit assessment, which is the essence of the medical art, sounds in negligence only and may not be case as a constitutional violation. Thus, it is well-settled that an allegation of "mere malpractice of medicine in prison does not amount to an Eighth Amendment violation. This principle may cover ... [an allegedly erroneous calculus of risks and costs. ...." *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir.2000).

*Kietz*, 2014 WL 1316129, at *13; *see also Reynolds v. Wagner*, 128 F.3d 166, 175 (3rd Cir. 1997) ("[T]he deliberate indifference standard of *Estelle* does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most

non-prisoners in our society."); *Caines v. Hendricks*, No. 05-1701, 2007 WL 496876, at *8 (D. N.J. Feb. 9, 2007) ("[I]t is not a constitutional violation for prison authorities to consider the cost implications of various procedures, which inevitably may result in various tests or procedures being deferred unless absolutely necessary."). Defendants submit that cost implications are a rational consideration as part of health-care decision making and management—especially in the context of a class action.

Historically, there are cases involving individuals finding that continual testing and monitoring of inmates with cHCV, such as through the chronic care clinic does not constitute deliberate indifference to a serious medical need. *See, e.g.*, *Dodson v. Wilkinson,* 304 Fed. Appx. 434, 439-40 (6th Cir. 2008); *See also Villarreal v. Holland,* No. 14-9-DLB, 2016 WL 208310, *8 (E.D. Ky. Jan. 15, 2016) (Plaintiff failed to produce medical records showing "that he has suffered actual harm due to the denial of the requested drug therapy treatment. . . . Ultimately, [plaintiff] has not shown that he had a 'sufficiently serious' medical need.. . . [Plaintiff] was examined, tested, and monitored on numerous occasions through the Chronic Care Clinic for his Hepatitis C condition. . . . Such ongoing and responsive medical treatment is the antithesis of deliberate indifference."); *Cowan v. Allen,* No. 4: 11-cv-00245-JHH-TMP, 2012 WL 3042438, *5-6 (N.D. Ala. July 5, 2012) ("It is clear that the decision to administer drug therapy for Hepatitis C is an extremely complicated one which involves consideration of numerous individual factors that differ from patient to patient. . . . It seems clear that States have a legitimate interest in . . . avoiding unnecessary expenditures of vital resources."); *Johnson v. Frakes,* No. 8:16CV155, 2016 WL 4148231, *3 (D. Neb. Aug. 4, 2016) ("Defendants' failure to provide Plaintiff with Harvoni, his

requested course of treatment, does not constitute an Eighth Amendment violation."); *Smith v. Corizon,* No. JFM-15-743, 2015 WL 9274915, *6 (D. Md. Dec. 17, 2015) (same).[4]

Plaintiffs have failed to show the "obduracy and wantonness" necessary to establish deliberate indifference. *See Wilson*, 501 U.S. at 299. The evidence above shows that medical staff at each TDOT facility regularly examine, evaluate, and monitor cHCV-infected inmates to determine whether their condition necessitates referral to TACHH for consideration of DAA

---

[4]   *Edmonds v. Robbins,* 67 Fed. Appx. 872, 873 (6th Cir. 2003) ("The record establishes that [the doctor] saw [plaintiff] on a monthly basis . . . [and] . . . feels that at this time, [plaintiff's] condition does not warrant medication . . . . Furthermore, the medical literature . . . establishes that medication is not always required for the treatment of hepatitis C. . . . [Plaintiff] has not established that [the doctor] is subjecting him to cruel and unusual punishment."); *Hix v. Tenn. Dept. of Corr.,* 196 Fed. Appx. 350, 357 (6th Cir. 2006) (Allegations that prison doctors did not prescribe the course of treatment for hepatitis C that prisoner desired, and opted to treat his symptoms rather than the underlying disease, "established nothing more than a mere difference of opinion with the doctors' diagnoses and prescribed treatment," and were insufficient to support a claim under § 1983 for deliberate indifference to his serious medical needs.); *Johnson v. Million,* 60 Fed. Appx. 548 (6th Cir. 2003) (Prison medical officials were not deliberately indifferent to inmate's medical condition after he contracted hepatitis C virus, where inmate was seen in prison hepatitis C clinic every three to four months, but was not provided drug treatment because his liver enzyme levels had stayed within normal range.); *Dotson v. Wilkinson,* 477 F. Supp.2d 838, 849 (N.D. Ohio 2007) ("The medical records . . . show that [plaintiff] has received the appropriate treatment for his condition within the medical protocols established for treatment of Hepatitis C, given [plaintiff's] high blood pressure and elevated creatinine levels. The delay in placing the plaintiff in the Hepatitis C treatment program does not 'constitute an unnecessary and wanton infliction of pain.'"); *Whiten. SeGure Care Co.,* No. 09-13787, 2011 WL 900296, *4 (E.D. Mich. Jan. 21, 2011) ("The case law is clear that the mere existence of a Hepatitis C infection is not necessarily a 'serious medical need'"); *Fetterhoff v. Kerney,* No. 07-15027, 2009 WL 612346, *7-8 (E.D. Mich. Mar. 6, 2009) ("[M]erely being diagnosed with HCV is not, by itself, a sufficiently serious medical need . . . . As many courts have acknowledged, HCV does not require treatment in all cases. . . . [P]laintiff's claim and evidence establish nothing more than a mere difference of opinion with the medical providers' assessment and prescribed treatment."); *Howze v. Hickey,* No. 10-CV-094-KKC, 2011 WL 673750, *7 (E.D. Ky. Feb. 17, 2011) ("Courts have recognized that Hepatitis C may require . . . [a] treatment regimen in some, but not all, situations. There is no uniform rule applicable to all cases."); *Allen v. Shawney,* No. 11- 10942, 2014 WL 1089618, *11 (E.D. Mich. Mar. 18, 2014) ("A medical need is sufficiently serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Alternatively, a medical need is sufficiently serious if a plaintiff '[p]laces verifying medical evidence in the record . . . establish[ing] the detrimental effect of the delay in medical treatment. . . . [N]ot all cases of hepatitis C require treatment. . . . There is no evidence to suggest that state 2 fibrosis requires urgent treatment . . . . [Further] Plaintiff has failed to show that any of the defendants had a subjectively sufficiently culpable state of mind . . . [W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.") (citations omitted); *Fitts v. Burt,* No. 05-CV-73112, 2009 WL 1213075, **3-4 (E.D. Mich. April 30, 2009) (Plaintiff's "'verifying medical evidence' of merely having Hepatitis C does not establish any 'detrimental effect of the delay in medical treatment' . . . . Accordingly . . . Plaintiff has not established the objective component of his deliberate indifference claim."); *Whitington v. Moschetti,* 423 Fed. Appx. 767 (10th Cir. 2011) (Inmate was not substantially harmed by a delay in treating his Hepatitis C condition, as required to prevail on his claim of an Eighth Amendment violation. There was no evidence of substantial progression of liver disease).

22

treatment. Those efforts are not so woefully inadequate as to amount to no treatment at all. *See Rhinehart*, 894 F.3d at 739 (holding that, where an inmate with ESLD was regularly monitored and evaluated, "no reasonable jury could find that [the inmate's] treatment amounted to no treatment at all[.]"). The medical staff at TDOC facilities and members of TACHH make treatment decisions regarding cHCV-infected inmates using their professional medical judgment; and the Sixth Circuit "is deferential to the judgments of medical professionals." *Richmond*, 885 F.3d at 940. As such, this Court should decline Plaintiffs' invitation to second-guess those treatment decisions and dismiss this motion for summary judgment.

### c. Expert Testimony Is Required To Support Plaintiffs' Claims

Plaintiffs rely on *Blackmore v. Kalamazoo County* for the proposition that deliberate indifference can be established without expert testimony if a medical need "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." ECF No. 93 at 8, Page ID# 1074. (citing *Blackmore*, 390 F.3d at 897). Indeed, perhaps in reliance on *Blackmore*, Plaintiffs' ASUMF does not reference the testimony of their own medical expert, nor have Plaintiffs placed the opinion of their own medical expert in the record.[5] Such medical evidence as Plaintiffs rely on in their ASUMF is disputed, unsupported by the record, or both. But the Sixth Circuit has since made clear that the ruling in *Blackmore* is the exception to the general rule requiring medical proof to substantiate an Eighth Amendment medical indifference claim. *See, e.g., Santiago*, 734 F.3d at 591 (dismissing a medical indifference claim where there was no medical expert testimony because when "a claim [is] based on the prison's failure to treat a

---

[5] *Cf.* ECF No. 93, Page ID# 1069 ("Plaintiffs' medical expert advocates …"). As Plaintiffs have not relied upon their medical expert, Dr. Yao, in making their Amended Motion for Summary Judgment, Defendants have not expressly included in our DSAMF references to Defendants' medical experts rebutting portions of Dr. Yao's expert report.

condition adequately, 'medical proof is necessary to assess whether the delay caused a serious medical injury.'" (citing *Blackmore*, 390 F.3d at 898)).

### d. Defendants' Expert Testimony Raises Disputed Issues of Fact Regarding Adequacy of Care

Defendants' LR56.01(c) response to the ASUMF provides additional facts that Defendants contend are material and as to which Defendants contend there exists a genuine issue to be tried. In summary, Defendants submit expert proof that the effectiveness of DAAs to prevent end-stage liver disease has not been validated by applicable principles of evidence-based medicine. In the absence of a validated "cure" for cHCV at any stage, it is not medically necessary to prescribe and administer DAAs to patient-inmates with low fibrosis scores, specifically those with METAVIR scores of F0, F1, and F2, as most cHCV patients with lower fibrosis will not progress over a period of decades. Those patient-inmates can be treated by means of "active surveillance" to ensure that if disease progression does occur, it will be addressed with available DAA regimens as needed. While the effectiveness of DAAs has not been validated, no alternative treatment is now available for patient-inmates with METAVIR scores of F3 and F4, as to whom TDOC practices and procedures specify that treatment with DAAs is to be administered.

### e. Plaintiffs' Claim to Declaratory or Injunctive Relief Should Be Denied

Plaintiffs have not met their burden of affirmatively showing the absence of genuine disputes of material fact on this record demonstrating deliberate indifference on the part of any of the Defendants. Only if the Court finds the Eighth Amendment's subjective and objective requirements are satisfied may the Court grant declaratory or injunctive relief. *See Farmer*, 511 U.S. at 846. As the Court must assume the truth of direct evidence submitted by Defendants and must draw all justifiable inferences in favor of Defendants, there remain genuine issues of material

24

fact for trial, precluding summary judgment in favor of Plaintiffs. As summary judgment must fail, Plaintiffs have not proven that declaratory or injunctive relief is due.

## IV. Conclusion

Plaintiffs have not met their burden of affirmatively showing the absence of genuine disputes of material fact on this record. As the Court must assume the truth of direct evidence submitted by Defendants and must draw all justifiable inferences in favor of Defendants, there remain genuine issues of material fact for trial, precluding summary judgment in favor of Plaintiffs.

Respectfully submitted,

**HERBERT H. SLATERY III**
**Attorney General and Reporter**


/s/ Steven A. Hart_____
STEVEN A. HART, TN BPR No. 7050
Steve.Hart@ag.tn.gov
Special Counsel, Public Interest Division

PAMELA S. LORCH, TN BPR No. 8968
Pam.Lorch@ag.tn.gov
Senior Asst. Attorney General
Post Office Box 20207
Nashville, Tennessee 37202-0207

JAMES R. NEWSOM III, TN BPR No. 6683
Jim.Newsom@ag.tn.gov
Special Counsel
Office of the Attorney General and Reporter
40 South Main Street, Suite 1014
Memphis, TN 38103-1877

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of July, 2018 a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the electronic filing system. Service has thus been made upon Plaintiffs' counsel of record:

Thomas H. Castelli
American Civil Liberties Union Foundation of Tennessee
PO Box 120160
Nashville, TN 37212

/s/ Steven A. Hart
STEVEN A. HART, TN BPR No. 7050