# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **GREGORY ATKINS, CHRISTOPHER GOOCH, KEVIN PROFFITT, and THOMAS ROLLINS, JR.,** on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 3:16-CV-1954** |
| **TONY C. PARKER, Commissioner, Tennessee Department of Corrections; and DR. KENNETH WILLIAMS, Medical Director, Tennessee Department of Corrections,** in their official capacities, | ) ) ) ) ) ) | **Judge Crenshaw** **Magistrate Judge Brown** |
| **Defendants.** | ) | |

_____

## PLAINTIFFS' POST-TRIAL BRIEF
_____

Pursuant to the Court's order, Dkt. 219, ¶ 7, Plaintiffs Gregory Atkins, Christopher Gooch, Kevin Proffitt, and Thomas Rollins, Jr. ("Named Plaintiffs" or "Plaintiffs"), on behalf of themselves and all others similarly situated, hereby submit this post-trial brief containing Plaintiffs' proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

**I.     Deprivation of Constitutional Rights under Section 1983**

1.      Defendants were acting under color of state law at all times relevant to this case. Stipulation, Dkt. 219, ¶ 4.

2.      Defendant Tony Parker is the Commissioner of the Tennessee Department of Corrections ("Department"). Trial Tr. Vol. 1, 26: 11-12; Stipulation, Dkt. 198, ¶ 12.

3. The Commissioner is essentially the Chief Executive Officer of the Department and is charged with overseeing the administrative functions of the Department. Trial Tr. Vol. 1, 27:1-9; 73:15- 8.

4. The Commissioner is vested with authority over Department employees, including the Director of Medical Services. Trial Tr. Vol. 1, 28:18-25; 29:1-13.

5. The Commissioner has ultimate authority to replace or fire the Director of Medical Services. Trial Tr. Vol. 1, 34:12-21.

6. Defendant Kenneth Williams, M.D., Ph.D., is the Director of Medical Services and the Chief Medical Officer of the Tennessee Department of Corrections. Trial Tr. Vol. 1, 172:18; Stipulation, Dkt. 198, ¶ 10.

7. Dr. Williams is also responsible for the pharmacy department, but he no longer holds the title of Director of Pharmacy. Trial Tr. Vol. 1, 172:16-23.

8. Dr. Williams is responsible for developing and updating medical policies for the inmate population, ensuring adherence to those policies and protocols, and managing the medical vendor contracts and the pharmacy contract. Dr. Williams also has oversight of the clinical services auditing team and is responsible for case management and coordination of the delivery of health care with the operations staff. Trial Tr. Vol. 1, 173:1-14; Stipulation, Dkt. 198, ¶ 11.

9. Dr. Williams has worked for the Department since October 2012 and has held the position of Chief Medical Officer since 2014 or 2015. Trial Tr. Vol. 1, 173:18-22.

10. Dr. Williams' residency training was in family medicine. He is not an infectious disease or liver disease specialist. Trial Tr. Vol. 1, 176:7-11.

11. Dr. Kenneth Wiley is the Associate Medical Director for the Department. Trial Tr. Vol. 1, 109:16-20. Dr. Wiley reports to Dr. Williams. Trial Tr. Vol.1, 174:2-9.

12. Dr. Wiley is trained in internal medicine with a background in primary care. Trial Tr. Vol. 1, 98:6–9.

## II. Eighth Amendment Violation

### a. Class Members Suffer a Serious Medical Need

13. Hepatitis C is a serious medical need. Stipulation, Dkt. 219, ¶ 4 ("Plaintiff and Plaintiffs' class have HCV which is a serious medical need.").

14. The Hepatitis C virus ("HCV") is an infectious disease that affects the liver as well as other organs in the human body. Trial Tr. Vol. 2, 9:20-23.

15. HCV is a bloodborne pathogen, usually transmitted through blood transfusion, IV drug use, or tattoos. Trial Tr. Vol. 2, 10:15-16; 32:19-33:1; Stipulation, Dkt. 198, ¶ 1.

16. While the word "hepatitis" means inflammation of the liver, Hepatitis C is really a systemic disease that effects the entire organ system beyond the liver. Trial Tr. Vol. 2, 9:23-25.

17. Annually, about 20,000 people die from Hepatitis C. Trial Tr. Vol. 2, 10:5-6.

18. The mortality rate for HCV is higher than the other 60 reportable infectious diseases combined. Trial Tr. Vol. 2, 99:12-15; 98:25-3.

19. An HCV infection occurs in two stages: acute and chronic. Trial Tr. Vol. 2, 16:15-19.

20. The infection is considered acute during the six-month period after a patient is initially exposed to the virus. Trial Tr. Vol. 2, 10:7-10; Stipulation, Dkt. 198, ¶ 2.

21. Usually, diagnosis of acute HCV is made based on a patient's reported medical history. Trial Tr. Vol. 2, 52:13-23; 110:13-14.

22. Most patients are already in the chronic stage when they are tested and diagnosed with HCV. Trial Tr. Vol. 2, 51:14-19.

23.     During the acute stage, roughly 15-25% of HCV infected individuals patients may clear the virus spontaneously.  Trial Tr. vol. 2, 10:7-10; Stipulation, Dkt. 198, ¶ 3.

24.     If the infection persists after that six-month period, it is chronic HCV.  Trial Tr. vol. 2, 110:20-24.

25.     About 75-85% of patients with acute HCV will develop chronic Hepatitis C. Trial Tr. Vol. 2, 108:9-10; Stipulation, Dkt. 198, ¶ 4 ("In a majority of infected patients, hepatitis C infections do not spontaneously resolve, but result in chronic HCV infection.").

26.     Chronic HCV infection does not spontaneously clear.  Trial Tr. Vol. 2, 43:22-24.

27.     Symptoms of HCV in both the acute and chronic phases include fatigue, jaundice of the eyes and skin, nausea, and pain the upper right quadrant.  Trial Tr. Vol. 2, 10:19-24; Trial Tr. Vol. 1, 105:5-106:17.

28.     Living with HCV weakens a patient's system making them more suspectable to major organ damage, diabetes and cancer.  Trial Tr. Vol. 1, 106:10-20.

29.     Because the Hepatitis C virus can affect other organs in addition to the liver, infected individuals can also have symptoms such as vasculitis, skin lesions, as well as kidney, heart, and cognitive disfunctions.  Trial Tr. Vol. 2, 10:25-11:4.

30.     Symptoms of Hepatitis C begin in the acute phase and continue to worsen throughout the chronic phase as liver damage progresses.  Trial Tr. Vol. 2, 11:5-10.

31.     When the liver is damaged, it grows fibrosis or scar tissue.  That scar tissue builds up over time, leading to liver cirrhosis or liver cancer.  Trial Tr. Vol. 2, 11:11-16.

32.     Fibrosis simply reflects the stage of Hepatitis C.  Symptoms are indicative of liver function.  Trial Tr. Vol. 2, 11:17-23.

33. In addition to liver function, symptoms are indicative of HCV's effect on kidney function, metabolism, and the immune system. Trial Tr. Vol. 2, 11:24-4.

34. Symptoms can occur regardless of a patient's fibrosis stage. Some patients may have mild fibrosis, but severe symptoms. Trial Tr. Vol. 2, 12:5-12; 104:11-105:7.

35. The liver is the biggest organ in the human body, and it affects our ability to process the nutrition we need for energy and our ability to filter toxic materials. When a liver is failing and cannot process those toxins, that causes cognitive defects called hepatoencephalopathy, meaning that the person cannot think clearly and is mentally impaired. Trial Tr. Vol. 2, 12:15-13-4.

36. Cirrhosis is the late stage of liver scarring. There are two types of cirrhosis: compensated cirrhosis, which is asymptomatic, and decompensated cirrhosis, which is symptomatic. Stipulation, Dkt. 198, ¶ 7.

37. Individuals with cirrhosis are at risk of developing primary liver cancer, called hepatocellular cancer. Stipulation, Dkt. 198, ¶ 7.

38. When a person has decompensated cirrhosis, the liver has deteriorated such that it cannot support the other organs required for the body to function. Trial Tr. Vol. 2, 13:7-14.

39. Decompensated cirrhosis is known as end-stage liver disease or liver failure. The only way to treat that condition is with a liver transplant. Trial Tr. Vol. 2, 13:15-19.

40. Chronic HCV is the leading cause of liver failure and the number one reason for liver transplantation in the United States. Trial Tr. Vol. 2, 13:20-22; 115:15-20.

41. Roughly 20-40% of patients with chronic HCV will progress to cirrhosis and about 4% will develop liver cancer. Trial Tr. Vol. 2, 10:11-12; 97:9-21.

42.     If untreated, Hepatitis C is ultimately fatal.  Some patients will die from liver failure causing multiorgan failure.  Some patients will have portal hypertension and esophageal varices which burst, causing the patient to vomit blood and die instantly.  Others suffer from kidney deficiencies, hepatoencephalopathy, or infections from fluid leaking into the stomach from the liver before they die.  Trial Tr. Vol. 2, 36:19-37:20.

Example – Russell Davis

43.     Russell Davis was diagnosed with Hepatitis C in 2009 while in TDOC custody. Trial Tr. Vol. 3, 7:14-15, 8:20-9:6.

44.     In 2009, Mr. Davis agreed to be treated with interferons after a conversation with prison medical personnel.  Prison medical personnel failed to provide him with the interferon treatment.  Trial Tr. Vol. 3, 9:7-17.

45.     In 2013, prison medical personnel sent him to Special Needs (Deberry) for HCV treatment.  Trial Tr. Vol. 3, 11:5-12.

46.     However, a year passed, and Mr. Davis still had not received treatment for his HCV.  Trial Tr. Vol. 3, 12:8-13; 13:8-9.   He was eventually informed that he was not on the list and therefore not going to be treated for his HCV.  Trial Tr. Vol. 3, 12:14-20; 13;11-17.

47.     Mr. Davis continued to make written and verbal complaints about his lack of HCV treatment.  Trial Tr. Vol. 3, 13:18-19.

48.     Medical personnel at each prison told Mr. Davis there was nothing they could do to treat his HCV.  Trial Tr. Vol. 3, 14: 4-11.

49.     Mr. Davis signed paperwork consenting to treatment at least six times but never received treatment.  Trial Tr. Vol. 3, 15:11-15.

50.     Mr. Davis signed paperwork for HCV treatment that had interferon information on it when, in fact, the prison had stopped treating inmates with interferons at that point. Medical personnel also reviewed side effects of interferon treatment (which were severe) even though interferon treatment was no longer being offered.  Trial Tr. Vol. 3, 16:11-14.

51.     Despite his advanced fibrosis stage, Mr. Davis was denied treatment for his HCV for nine years.  Trial Tr. Vol. 3, 26: 21-24.

52.     His medical file notes that Mr. Davis was at fibrosis stage 2 in September 2016, Pls' Tr. Exh. 39, p. 30 (DEF0010239); Trial Tr. Vol. 3, 20:8-17, and stage 4 by at least May 2017.  Pls.' Tr. Exh. 3, p. 18 (DEF0010227).

53.     Nevertheless, TACHH denied him treatment in its January 10, 2017 meeting stating: "Follow up in 12 months. Get staging. Follow labs in CCC."  Joint Tr. Exh. 9.

54.     Nine years after his HCV diagnosis, the Department finally approved him for treatment in March 2018, Joint Tr. Exh. 23, and treated Mr. Davis' HCV with DAAs beginning in April 2018.  Trial Tr. Vol. 3, 16:2-18; Pls.' Tr. Exh. 39, p. 172 (DEF0010381).

55.     However, because he had already reached an advanced stage of fibrosis, F4, before receiving treatment, he now has to receive periodic monitoring and testing for liver cancer for the rest of his life.  Trial Tr. Vol. 3, 16:18-18:14; 22:14-23:5; 24;14-21; 24:25-26:21; 34:6-20; 37:23-38:21.

56.     Mr. Davis was first referred to an infectious disease specialist in 2018.  Trial Tr. Vol. 3, 16: 22-24.

57.     Mr. Davis was not informed of his F4 cirrhosis diagnosis until after his DAA treatment.  Trial Tr. Vol. 3, 22:22-25, 23:1-4.

58. The specialist told Mr. Davis that he had Stage 4 cirrhosis of the liver and other problems associated with having HCV. Trial Tr. Vol. 3., 17:2-4.

59. At Meharry Hospital, after his DAA treatment, a doctor informed him that as a result of his advanced cirrhosis, his stomach had pressed into his esophagus and caused a hernia. Trial Tr. Vol. 3, 17:25-18:5.

60. Prison medical providers have informed Mr. Davis that he may not have long to live. Trial Tr. Vol. 3, 24:3-5.

Example – Samuel Hensley

61. Samuel Hensley was diagnosed with HCV upon intake in the TDOC system in 2006. Trial Tr. Vol. 3, 40:25- 41:4.

62. Mr. Hensley begged prison medical providers for treatment for his HCV because he suffered substantial and constant pain in his upper right quadrant, which also caused him to have insomnia. Trial Tr. Vol. 3, 45:1-9.

63. As late as 2016, prison medical providers told him that the only treatment he could receive for his HCV was interferons, which he was told had harmful side effects, and probably would not want to take. However, TDOC had stopped treating inmates with interferons by 2016. Trial Tr. Vol. 3, 43:9-17.

64. Nobody from the prison informed Samuel Hensley that the consent to treatment forms for HCV contained inaccurate material information about interferon treatment. Trial Tr. Vol. 3, 46:3-12.

65. Mr. Hensley testified that when he described painful symptoms of HCV, medical providers would not put those complaints in the medical notes. Trial Tr. Vol. 3, 46:25-47:7.

66.     The facility physician, Dr. Dietz, referred his paperwork to Nashville.  TACHH did not have Mr. Hensley's paperwork.   Trial Tr. Vol. 3, 47:22-48:1; 47:8-21.

67.     TACHH finally approved treatment in May 2018; however, despite having advanced cirrhosis (F4), Mr. Hensley did not actually receive the treatment for 7 more months, suffering constant pain while waiting for care.  Joint Exh. 26; Trial Tr. Vol. 3, 41:25-42:8; Plts' Tr. Exh. 41.

### b.  Defendants Are Deliberately Indifferent to that Need

68.     Defendants have knowledge of Plaintiffs' and Class members' serious medical need.  Stipulation, Dkt. 219, ¶ 4.

69.     Many inmates file grievances, write letters, and ask family members to reach out to TDOC officials, including Defendants Parker and Williams, for treatment for Hepatitis C.  For example, Russell Davis began filing complaints to receive treatment for his HCV after his diagnosis in 2009.  Trial Tr. Vol. 3, 10:3.

70.     Mr. Davis wrote letters to both the governor of Tennessee and the Commissioner of TDOC, Tony Parker, about his lack of HCV treatment.  Trial Tr. Vol. 3, 13:19-20.

71.     On or about September of 2016, Commissioner Parker visited West Tennessee State Penitentiary, at which time Mr. Davis asked Mr. Parker directly if he could speak with him about HCV.  Mr. Parker walked away.  Trial Tr. Vol. 3, 26:2-12.

72.     Thomas Rollins' wife contacted Commissioner Parker's office, which referred her to Dr. Williams. Dr. Williams contacted his wife.  She told him he was sick, but he responded that Mr. Rollins was not sick enough to be treated for HCV.  Trial Tr. Vol. 3, 141:3-11.

73.     Defendants consider Hepatitis C to be a "silent epidemic" within the Tennessee correctional system.   Plts' Tr. Exh. 60, p. 3.

74.     In January 2019, the number of inmates with HCV was approximately 4,388. Trial Tr. Vol. 2, 163:3-14; Pls.' Tr. Ex. 18.

75.     At the time of trial, there were approximately 4,740 known Class members who had been diagnosed with Hepatitis C.  Stipulation, Dkt. 198, ¶ 21.

76.     The number of HCV+ inmates continues to increase. Trial Tr. Vol. 2, 165:6-7.

77.     There are many more HCV+ inmates than are currently known because, unlike with other contagious illnesses, TDOC has not historically tested all inmates for HCV.  Thus, some percentage of the current correctional population has never been tested for Hepatitis C. Trial Tr. Vol. 1, 115:20-23; Trial Tr. Vol. 2, 199:11-200:4.

78.     Defendants maintain spreadsheets identifying all known HCV+ inmates.  Pls.' Tr. Exh. 12, 13, 19, 20, 22, 23, 24, 25, 28-33.

79.     Some of those known Class members have been assigned a fibrosis score, and some have not.  *Id.*

80.     Defendants maintain a spreadsheet showing the identities of all known F4s, F3s, F2s, F1s, and F0s.  Pls.' Tr. Exh. 14; Trial Tr. Vol. 2, 263:6-13.

81.     According to that document, there are 373 F4s; 46 F3-4s; 293 F3s; 218 F2s; 413 F1-2s; 141 F1s; 220 F0-1s; and 787 F0s.  Plts' Tr. Exh. 14.

82.     Defendants acknowledge the need to treat F4s, F3s, and those with co-morbidities with DAA medication.  Joint Tr. Exh. 38; Trial Tr. Vol. 3, 223:25-224:2, 224:21-225:2.

83.     However, Defendants have no immediate plan to commence treatment for all known priority candidates.  Defendants plan only to continue with monthly TACHH meetings until everyone is treated, which will likely take several years.  Trial Tr. Vol. 2, 227:14-228:19.

84.     The Department is aware that HCV is a contagious condition that constitutes a public health issue. Trial Tr. Vol. 1, 99: 20-24; Stipulation, Dkt. 198, ¶ 4.

85.     The Department is aware of an increasing number of inmate deaths in the TDOC system caused by untreated Hepatitis C.  In fact, Dr. Williams conducts a mortality review for every inmate that dies in the Department's custody.  Trial Tr. Vol., 169:22-25; 170:1-3.

86.     Through that mortality review, Dr. Williams has knowledge of 109 inmates who have died from complications of HCV.  Plts' Tr. Exh. 1-7.

87.     More than 109 inmates have died during this time period, because some deaths, such as that of Michael Powell, are not captured in the morality review.  *Id.*; Trial Tr. Vol. 3, 179:16-180:12; 181:9-11.

88.     In response to the Hepatitis C epidemic, Dr. Williams created the TDOC Advisory Committee on Hepatitis C and HIV in 2014 ("TACHH" or "Committee").  Trial Tr. Vol. 2, 240:23-241:4; Pls' Tr. Exh. 61.

89.     TACHH does not review HIV cases, it only reviews cases of HCV.  Trial Tr. Vol. 1, 100:19-101:1.

90.     The purpose of TACHH is to ration DAAs among HCV+ inmates.  Deposition Designation of Dr. Keith Ivens, Jan. 12, 2018, 51:2-4 (purpose of TACHH to "spread liability").

91.     Historically TACHH met once a month.  Only twice in 2019 has TACHH met twice in one month.  Trial Tr. Vol. 2, 142: 12-16.

92.     Typically, TACHH considers 20-30 inmates for treatment per month.   In its most recent meeting, TACHH considered 47 inmates, the most considered in any month since its inception.  Joint Tr. Exh. 37; Trial Tr. Vol. 2, 140:20-141:5

93.     TACHH meetings last about one hour.  Trial Tr. Vol. 2, 151:19-20.

{005144/16221/00489250.DOCX / Ver:1}

94. TACHH decides whether or not an inmate is going to receive treatment for Hepatitis C. Deposition Designation of Dr. Bernard Dietz, 59:6-9; Stipulation, Dkt. 198, ¶ 17.

95. Medical providers at the facilities cannot treat inmates for Hepatitis C. Deposition Designation of Dr. Dietz, 48:16-18; 48:24-25.

96. DAA medication is nonformulary, meaning that a treating physician in a facility could not write a prescription for DAAs without TACHH approval. Trial Tr. Vol. 1 134:10-14; Trial Tr. Vol. 2 261: 9-22.

97. No medical provider has ever disagreed with TACHH or requested that Dr. Williams approve DAAs outside of the TACHH framework. Trial Tr. Vol. 2, 247:1-5; 248:16-249:16.

98. In contrast, patients with HIV are sent to a specialist through the department telemedicine policy and procedure. Trial Tr. Vol. 2, 162:1-11.

99. Dr. Williams is the chair of the TACHH. Trial Tr. Vol. 2, 241:3-4.

100. Dr. Wiley has been a member of the TACHH committee for many years. Trial Tr. Vol. 1, 100:11-16; 123:9-15.

101. In addition to Dr. Williams and Dr. Wiley from the Department, current TACHH members include: Dr. Keith Ivens, chief medical officer for CoreCivic, Dr. Neau, associate chief medical officer for CoreCivic, Tiffany Bonds, regional clinical RN for Centurion, Jeremy Chase, RN Coordinator for Centurion, and Dr. Daniel Dewsnup with Centurion. Trial Tr. Vol. 1, 126:2-12; 127:14-128:19; Joint Tr. Exh. 37 (5-29-19 Minutes).

102. Dr. Dewsnup is the only member of TACHH that is an infectious disease specialist. He is not a resident of the state of Tennessee and does is not licensed to practice medicine in the state of Tennessee. Trial Tr. Vol. 2, 141:21; 142:8-11; 152:23-153:5.

103. Dr. Dewsnup does not participate in every TACHH meeting. When he is absent, there is no infectious disease specialist represented on TACHH. Trial Tr. Vol. 2, 142:8-11.

104. An inmate's primary care provider must submit the inmate's case to the TACHH to be considered for DAA treatment. Trial Tr. Vol. 1, 129:24-130:3.

105. TACHH relies on the 2019 Guidance when determining which inmates should receive treatment. Trial Tr. Vol. 2, 136:7-9, Joint Tr. Ex. 38.

106. TACHH does not meet with or otherwise communicate with the treating medical provider when making treatment decisions. Trial Tr. Vol. 1, 130:4-16.

107. TACHH does not meet with or examine the inmate when making treatment decisions about that patient. Trial Tr. Vol. 1, 138:4-5; 153:1-13l 137:18-138:5.

108. The TACHH committee's decision is based solely on a review of laboratory data and test results. Trial Tr. Vol. 1, 131:15-21.

109. TACHH also determines which of the various types of DAAs will be used to treat an individual patient and the length of treatment. Trial Tr. Vol. 1, 137:2-8.

110. Providers do not know when, or if, they will receive a response from the TACHH. Deposition Designation of Dr. Dietz, 59:2-5.

111. Since 2016, TACHH has only authorized the treatment of approximately 450 inmates with DAAs, or less than 10% of the known population of infected inmates. Trial Tr. Vol. 2, 166:22-25.

112. The TACHH keeps minutes showing which inmates the committee approves for treatment and which were not approved. Trial Tr. Vol. 1, 108:25-109:3, 132:17-133:3.

113. Defendants make Hepatitis C treatment decisions based on cost. *See, e.g.*, Trial Tr. Vol. 1, 118:4-23 (husbandry of resources).

114. The Department, CoreCivic, and Centurion are all responsible for the costs of DAA medication. Trial Tr. Vol. 1, 126:16-25; 127:1-4.

115. Dr. Williams is responsible for requesting funds for the provision of medical services to the Commissioner and Chief Financial Officer. Trial Tr. Vol. 1, 53-9-12.

116. The Commissioner is responsible for presenting a budget request to the Governor's administration and the General Assembly each year. Trial Tr. Vol. 1, 52:11-23.

117. The Department acknowledges that "it is not impossible to treat in the face of limited resources." Trial Tr. Vol. 1, 121:5-9.

118. However, Defendants have never requested enough funding to treat all inmates with Hepatitis C. Trial Tr. Vol. 1, 71:5-72:9, 93:3-15; Trial Tr. Vol. 2, 228:24-229:9; Trial Tr. Vol. 2, 268:23-269:19.

119. In Fiscal Year 2017, which ran from July 2016-July 2017, the Commissioner requested and received only $2,000,000 for the budget for the treatment of HCV. Trial Tr. Vol. 1, 54:6-10.

120. With that money, the Department could treat only 33 patients. Plts' Trial Exh. 34.

121. In fiscal year 2019, the Commissioner again requested and received only $2,000,000.00 for the budget for the treatment of HCV. Trial Tr. Vol. 1, 55:11-12.

122. In fiscal year 2020, the Commissioner requested $24.6 million for the treatment of HCV based on Dr. Williams' recommendation that more money was need to treat Hepatitis C, and the Department received that amount in its budget. Trial Tr. Vol. 1, 55:12-14; 70:3-2.

123. Commissioner Parker did not ask Dr. Williams why he needed the $24.6 million or ask how many inmates that amount would treat. Trial Tr. Vol. 1, 93:13-21.

124.    Dr. Williams estimates that the $24.6 million could be used to treat 1800 to 1900 inmates for HCV, which is only one third (1/3) of the inmates that the Department knows are infected with the disease.  Trial Tr. Vol. 2, 167:9-13.

125.    The price of DAAs typically now range from $15,000 to $20,000 a course, but Defendants have negotiated prices as low as $4,493.51.  Trial Tr. Vol. 1, 123:3-5; Trial Tr. Vol. 2, 221:15-222:8; Defs' Tr. Exh. 14 (Zepatier, 2018).

126.    In Fiscal year 2016, the Department spent only $392,907 for the treatment of Hepatitis C.  Plts' Trial Exh. 34.

127.    In Fiscal Year 2015, the Department spent only $275,260 for the treatment of Hepatitis C.  Plts' Trial Exh. 34.

128.    Commissioner Parker does not have day-to-day communication with Dr. Williams concerning the provision of medical care in the Department. Trial Tr. Vol. 1, 34:22-25 – 35:1.

129.    From time to time, Commissioner Parker overhears conversations about medical care during senior management meetings, but otherwise makes no effort to investigate or address the Department's gross lack of HCV treatment.  Trial Tr. Vol. 1, 35:1-5.

130.    When a medical policy or procedure is submitted for Commissioner Parker's approval, he is provided with a summary of the policy, and documentation that it has gone through the formal process and been reviewed by the Assistant Commissioner of Rehabilitative Services and the Director of Medical Services.  Trial Tr. Vol. 1, 43:13-24.

131.    Commissioner Parker has the authority to raise questions about any policy and to send it back for further review.  Trial Tr. Vol. 1, 44:7-8.

132.    However, in practice Commissioner Parker does not even read the entire policy before approving it.  Trial Tr. Vol. 1, 44:1-2.

133.     With regard to medical policies, Commissioner Parker has approved all policies without revisions and relies wholly on the expertise of his employees. Trial Tr. Vol. 1, 44:17-25; 184:13-16.

134.     Commissioner Parker is aware that there are over 4,000 inmates currently infected with HCV.  Trial Tr. Vol. 1, 45:9-14.

135.     Commissioner Parker knows that DAAs are the medicine used to treat HCV, and he knows there is a need for DAA medications within the correctional system.  Trial Tr. Vol. 1, 58:5-14; 72:21-73:2.

136.     However, Commissioner Parker has failed to request information about the cost of DAAs, how the Department is using them, or anything else related to DAA treatment.  Trial Tr. Vol. 1, 58:8-24.

137.     Even after learning that the price of DAAs "has come down," Commissioner Parker failed to investigate what that meant or how it might affect inmates' care.  Trial Tr. Vol. 1, 58:23-59:11.

138.     Although he has known about a committee that reviews HCV cases since before 2016, Commissioner Parker has never sought additional information about it or otherwise made any effort to learn about it.  Trial Tr. Vol. 1, 89:7-15; 59:12-24, 85:24-86:9; 89:2-6; 90:11-24.

139.     Commissioner Parker has never inquired as to who the committee members were, who the chairs the committee were, when it met, or what it does apart from making treatment decisions for HCV cases.  Trial Tr. Vol. 1, 87:10-24.

140.     Commissioner Parker has attended annual, national conferences for correctional administrators where he learned about Hepatitis C. Trial Tr. Vol. 1, 83:15-84:17.

141. Despite this knowledge, Parker made no effort to understand the sufficiency Dr. Williams' recent $24 million budget allotment or even how many inmates such amount would treat. Trial Tr. Vol. 1, 71:5-72:9; 93:3-15.

142. Since this lawsuit was filed three years ago, Commissioner Parker has never bothered to have a single conversation with Dr. Williams or any other Department employees about treatment of Hepatitis C in TDOC facilities. Trial Tr. Vol. 1, 93:22-24; 94:2-16.

143. Commissioner Parker has the authority to consult with other departments, such as the Department of Health, regarding the treatment of HCV. Parker has not done so. Trial Tr. Vol. 1, 94: 17-25; 95: 1-7.

144. Commissioner Parker is unaware of how many inmates his Department has treated with the DAAs. Trial Tr. Vol. 1, 59;9-10.

Example – Greg Atkins

145. Gregory Atkins is a F4 and has had cirrhosis of the liver since 2013. Trial Tr. Vol. 3, 78:8-15; 79:1-2; 85: 23-25; Plts' Tr. Exh. 36.

146. TDOC has never provided any treatment to Gregory Atkins for his HCV. Trial Tr. Vol. 3, 79:19-20.

147. Gregory Atkins is 42 years old and his sentence ends in 2020. Trial Tr. Vol. 3, 78:7-17.

148. Mr. Atkins informed TDOC of his HCV status upon entry into TDOC custody in 2005. Trial Tr. Vol. 3, 79:7-11.

149. Mr. Atkins continually asked prison medical providers for treatment between 2013 and 2017. Six of those requests are documented in Mr. Atkins' medical records. Despite

these repeated requests for treatment, prison medical providers failed to treat his HCV.  Trial Tr. Vol. 3, 86-91; Plts' Tr. Exh. 36, Trial Tr. Vol. 3, 83:6-8.

150.  TDOC approved Gregory Atkins for Interferon treatment for his HCV on June 17, 2013.  Trial Tr. Vol. 3, 79:23-25; Plt's Exh. 36.

151.  Despite being approved on June 17, 2013, TDOC never provided that treatment. Trial Tr. Vol. 3, 85:17-20.

152.  Medical providers at Bledsoe have not explained the condition of Mr. Atkins' liver to him.  Trial Tr. Vol. 3, 97:1-3.

153.  Dr. Gerrity opined that Mr. Atkins should be treated with DAAs.  Trial Tr. Vol 3, 231:5-7.

154.  TACHH has never considered Mr. Atkins for treatment.  Trial Tr. Vol. 3, 94:19-21; Joint Tr. Exhibit.

Example – Christopher Gooch

155.  Mr. Gooch is a F3 and has never received any treatment for his HCV.  Trial Tr. Vol. 3, 157:12-14.

156.  He was diagnosed with chronic HCV about two weeks after he entered Bledsoe (BCCX) on May 6, 2016. Trial Tr. Vol. 3, 157:7-11.

157.  Mr. Gooch has asked medical staff at BCCX for treatment for his HCV many times.  Trial Tr. Vol. 3, 159:8-13; 160:19-25; 161:1-5; Plts' Exh. 38 (Bledsoe 01898).

158.  The lab results from Mr. Gooch's bloodwork on December 28, 2018, indicated that his fibrosis score was an F2 bridging fibrosis with few septa.  Trial Tr. Vol. 3, 165: 4-9; Plts' Exh 38 (Defendant 00019883).

159.    Casey Dillon, a medical provider at BCCX, told Mr. Gooch that his HCV was rapidly progressing.  Trial Tr. Vol. 3, 166:5-8.

160.    A Fibroscan conducted five months later indicated that Mr. Gooch's fibrosis score had jumped from and F2 to an F3 in that very short period of time.  Trial Tr. Vol. 3, 168: 1-8, Plts' Exh 38 (Defendant 0019976).

161.    Dr. Gerrity opined that Mr. Gooch should be treated with DAAs.  Trial Tr. Vol. 3, 231:8-13.

162.    TACHH has never considered Mr. Gooch for treatment.  Trial Vol. 3, 165:12-14.

163.    Mr. Gooch is 29 years old. Trial Tr. Vol. 3, 169:13.

164.    Mr. Gooch is planning on waiving his parole hearing in October 2019, in part, so he can get treatment for his HCV.  Trial Tr. Vol. 3, 170:23-25; 171:1-8.

Example – Scott Spangler

165.    Scott Spangler is an inmate at Hardeman County Correction Facility (HCCF). Trial Tr. Vol. 3, 58:23-25.

166.    He has stage 4 fibrosis and acute hepatonecrosis. Plts' Exh. 46; Vol. 3, 69:1-6.

167.    Despite his advanced fibrosis stage, he has never received any treatment. Trial Tr. Vol. 3, 77: 6-8.

168.    After presenting symptoms of HCV in March of 2018, Mr. Spangler was given blood tests resulted in his diagnosis of Hepatitis C.  Trial Tr. Vol. 3, 59:13-25; 60:1-3.

169.    Mr. Spangler's sentence expires in December of 2019.  Trial Tr. Vol. 3, 59:4-7.

170.    In May, 2018, Mr. Spangler was told by a nurse practitioner, Ms. Herron, that he was ineligible for treatment because he was too close to his parole date in December, 2019.  Trial Tr. Vol. 3, 62:13-25; 63:1-7.

171.    Medical staff would not discuss Hepatitis C treatment with Mr. Spangler at all. Only after requesting an appointment for back pain was Mr. Spangler seen by a provider; however, he was not allowed to discuss his HCV.  Trial Tr. Vol. 3, 66:4-16.

172.    Mr. Spangler did not receive regular medical appointments and was not enrolled, or offered enrollment, in chronic care clinic despite having chronic HCV.  Trial Tr. Vol. 3, 66:24-25; 67:1-6.

173.    Mr. Spangler was prescribed Tylenol for his back despite having HCV and stage 4 fibrosis. Trial Tr. Vol. 3, 67:22-25; 68:1-8, 24-25.

174.    Mr. Spangler has requested HCV treatment from the prison medical department twice a week for the past year, but received no response. Trial Tr. Vol. 3, 65:19-25; 66:1-4.

175.    Dr. Gerrity opined that Mr. Spangler should be treated with DAAs.  Trial Tr. Vol. 3, 231:1-4.

176.    Mr. Spangler was denied treatment by the TACHH on August 29, 2018, despite the TACHH's awareness that he was at stage F4 and had hepatonecrosis.  Pls.' Tr. Exh. 46.

177.    After denying treatment in August 2018, the TACHH never reviewed Mr. Spangler's case again.  *See* Joint Tr. Exh. 30-35, Pls.' Tr. Exh. 47; Joint Tr. Exh. 36; Pls.' Tr. Exh. 48-29; and Joint Tr. Exh. 37.

Example – Kevin Proffitt

178.    Kevin Proffitt has Hepatitis C and is co-infected with Hepatitis B.  He has never been treated for Hepatitis C.  Trial Tr. Vol. 3, 119:10-12; 121:13-21.

179.    Mr. Proffitt was informed he had Hepatitis C during classification as an inmate in 2016.  Trial Tr. Vol. 3, 115:7-10.

180.    For ten months, in 2016, prison staff falsely informed Mr. Proffitt that he was clearing Hepatitis C.  Trial Tr. Vol. 3, 115:12-17.

181.    On May 2, 2018, Mr. Proffitt had bloodwork that confirmed that he was co-infected with Hepatitis B and C, with a HCV Fibrosis score of F1 - F2.  Trial Tr. Vol. 3, 118:11-22; Plts' Exh. 42 (Bledsoe 00577).

182.    In December of 2018, over a year and a half after being diagnosed with Hepatitis B, Mr. Proffitt began treatment for Hepatitis B and was again falsely informed that he was "clearing" Hepatitis C.  Trial Tr. Vol. 3, 115:22-25.

183.    Chronic HCV infection does not spontaneously clear. Trial Tr. Vol. 2, 43: 22-24.

184.    Mr. Proffitt is being treated for Hepatitis B, but medical providers have told conflicting information about how long the treatment for Hepatitis B lasts before he can begin treatment for Hepatitis C.  Trial Tr. Vol. 3, 117:22-25; 118:1-2.

185.    Mr. Proffitt is unclear of the status of his Hepatitis C or if and when he can begin his treatment. Trial Tr. Vol. 3, 115:4-6; 116:13-17; 117:23-25; 188:1-2.

186.    If a patient is co-infected with Hepatitis B, that co-infection must first be suppressed through medication to levels low enough to begin HCV treatment; this can usually be achieved in about two months. Trial Tr. Vol. 2, 34:15-22; Vol. 3, 118:6-9.

187.    People with coinfections should be treated quicker because a coinfection can accelerate the progress to cirrhosis and liver cancer. Trial Tr. Vol. 2, 33:2-22.

188.    In 2016, a nurse practitioner told Mr. Proffitt she would fill out paperwork for TACHH and turn it in but he probably wouldn't be approved because he was going up for parole. Trial Tr. Vol. 3, 120:16-24.

189.    Mr. Proffitt is eligible for parole in September of 2019. Trial Tr. Vol. 3, 121:9-12.

190.    Dr. Gerrity opined that Mr. Proffitt should be treated with DAAs.  Trial Tr. Vol. 3, 232:22-25.

191.    Mr. Proffitt was considered by the TACHH and approved for treatment on May 2, 2018.  Joint Tr. Exh. 26.

192.    However, over a year later, Mr. Proffitt still has not received DAA treatment. Trial Tr. Vol. 3, 119:10-12.

Example – Tom Rollins

193.    Tom Rollins is a 53-year-old inmate at Morgan County Correctional Complex. Trial Tr. Vol. 3, 130:1-5.

194.    Mr. Rollins was first diagnosed with Hepatitis C in 2001 or 2004 when he wasn't in prison. Trial Tr. Vol. 3, 130:13-15.

195.    Mr. Rollins was not enrolled in chronic care clinic for his HCV while at Trousdale in 2016.  Trial Tr. Vol. 3, 132:5-19.

196.    He was enrolled in the chronic care clinic for monitoring upon transfer to MCCX in 2017.  Trial Tr. Vol. 3, 132:19-25; 133:1-5.

197.    Mr. Rollins suffers from excruciating hip pain and walks with a cane.   He needs both hips replaced. Trial Tr. Vol. 3, 133:15-25.

198.    He cannot have hip surgery until his HCV is treated, and so he must live in constant pain until his fibrosis stage increases and he is considered by TACHH.

199.    Despite having Hepatitis C, Mr. Rollins was prescribed Tylenol 3 for his hip pain. Trial Tr. Vol. 3, 134: 3-7.

200.     Mr. Rollins' wife informed him that Tylenol could cause liver damage, so he stopped taking Tylenol.  He is not currently taking any medication for pain. He suffers constant pain from his hips.  Trial Tr. Vol. 3, 134:8-20.

201.     Mr. Rollins has been seeking treatment for his Hepatitis C ever since he has been in prison.  Trial Tr. Vol. 3, 134:25; 135:1-2.

202.     Mr. Rollins has symptoms that can be related to Hepatitis C such as rashes, arthritis, and high ammonia levels causing cognitive disfunction. Trial Tr. Vol. 3, 137:1-24.

203.     TACHH reviewed Mr. Rollins case in March 2019, when he was staged at F3, but denied him treatment with leave to reconsider his case in another year. Trial Tr. Vol. 3, 143:12-18; 151:7-18; Plts' Tr. Exh. 47 (3/15/19 Minutes).

204.     Mr. Rollins has not received any treatment for HCV.  Trial Tr. Vol. 3, 155:7-9.

### c.  Defendants' Policies and Practice Cause the Harm Plaintiffs' Suffer

205.     The Department has a responsibility to provide medical care for inmates in its custody.  Trial Tr. Vol. 1, 50:14-9; 51:8-12.

206.     The Department is responsible for the medical case of about 21,000 inmates. Trial Tr. Vol. 1, 115: 6-10; Stipulation, Dkt. 198, ¶ 20.

207.     Medical care for inmates in the custody of the Department falls under the supervision of the Assistant Commissioner of Rehabilitative Services and the Director of Medical Services, Dr. Williams. Trial Tr. Vol. 1, 28:3-8.

208.     The Commissioner's role with regard to medical care is to ensure that inmates have access to medical care. Trial Tr. Vol. 1, 52:3-8.

209.     The Department issues policies and procedures as an agency of the Tennessee government. Trial Tr. Vol. 1, 35:6-10.

### i. TDOC Policies

210.    Defendant Williams produced both the 2016 and 2019 Guidance for the

Department.  Stipulation, Dkt. 198, ¶¶ 13, 14; Trial Tr. Vol. 1, 196:1-15; 199:1-6.

The 2016 HCV Guidance

211.    The HCV Guidance documents are TDOC's only disease-specific policies.  Trial

Tr. Vol. 1, 197:9-14.

212.    The 2016 Guidance references AASLD/IDSA materials concerning treatment

recommendations.  Plts' Exh. 60, p. 11.

213.    Under the 2016 Guidance, inmates were only screened for HCV if they had

certain risk factors or if they affirmatively requested the test.  Trial Tr. Vol. 2, 203:18-25; 204:1-

8; Plts' Exh. 60.

214.    The 2016 Guidance instructed providers on pre-treatment assessments for inmates

receiving "interferon-containing regimens."  Plts' Exh. 60, p. 11.

215.    The HCV guidelines dictate which inmates the providers refer to the TACHH.

Plts' Exh. 60, p. 11; Deposition Designation of Dr. Dietz, 54:19-24.

216.    The 2016 Guidance instructed providers that only patients with F3 to F4 staging

should be referred to TACHH.  Plts' Exh. 60, p. 11.

217.    The 2016 Guidance provided only for the treatment of inmates who had a fibrosis

score of F3 or F4 with treatment with DAAs.  Plts' Exh. 60.

The 2019 HCV Guidance

218.    The 2019 HCV Guidance became Effective on May 22, 2019, less than two

months before trial.  Trial Tr. Vol. 1, 107:16-20.

219. The Inmate Peer Education Program Policy, which was approved by Commissioner Parker, became effective on June 15, 2019, about one month before trial. Defs' Tr. Exh. 1.

220. The 2019 Guidance on HCV Treatment supersedes the 2016 Guidance in providing instructions to institutional providers at all TDOC facilities. Trial Tr. Vol. 1, 155:21-156:2; Stipulation, Dkt. 198, ¶ 14.

221. The 2019 Guidance applies to all cases of chronic Hepatitis C. Trial Tr. Vol. 2, 137:22-25; 138:1-11; Joint Tr. Exh. 38.

222. TACHH and all TDOC health care providers are expected to adhere to the recommendations set forth in the 2019 Guidance. Joint Tr. Exh. 38, p. 1; Stipulation, Dkt. 198, ¶ 15, 16 ("The 2019 HCV Guidance provides controlling guidance for the evaluation, staging, tracking, and other treatment of patients with chronic HCV.").

223. The 2019 Guidance provides for opt-out screening at intake, meaning that individuals should be tested for HCV at intake, unless they refuse. Trial Tr. Vol. 2, 201:13-17, Joint Tr. Exh. 38.

224. After diagnosing chronic HCV, the 2019 Guidance requires treating physicians to perform three different tests on a patient to determine the fibrosis level and assign the patient a "F" score. The tests include two blood tests, an APRI and Fibrosure test, and an elastography scan using a FibroScan machine. Trial Tr. Vol. 1, 130:3-24; Joint Tr. Exh. 38.

225. The Department only has two Fibroscan machines for use in its fourteen facilities. Stipulation, Dkt. 198, ¶ 19.

226.     According to TDOC policy, inmates diagnosed with chronic HCV should be placed in a program called Chronic Care, where they should be seen by a healthcare provider every six months to have blood work performed.  Trial Vol. 1, 149:16-24; 179:1-13, 180:14-19.

227.     Patients are categorized or staged by the level of fibrosis indicated by the tests using the F0 through F4 scale.  Trial Tr. Vol. 2, 131:3-5.

228.     The blood tests also provide the genotype of the particular strain of HCV that a patient has.  Trial Tr. Vol. 2, 133:2-6; Joint Tr. Exh. 38.

229.     After the tests are complete, the treating physician then refers the patient to TACHH.  Trial Tr. Vol. 2, 134:3-5.

230.     The 2019 Guidance provides for two "pathologies," an "advanced pathology" and an "intermediate pathology."  Trial Tr. Vol. 2, 135:21-23.

231.     The advanced pathology includes inmates with a F4 or F3 score, inmates that have a coinfection of Hepatitis B or HIV, and inmates with certain comorbid conditions.  Trial Tr. Vol. 2, 136:10-24; Joint Tr. Exh. 38.

232.     The intermediate pathology includes patients with a score of F2 or who have chronic kidney disease.  Trial Tr. Vol. 2, 137: 1-10; Joint Tr. Exh. 38.

233.     The 2019 Guidelines do not provide for treatment of inmates with chronic Hepatitis C who do not fall into one of these two pathology categories.  Trial Tr. Vol. 2, 139:11-16; Joint Tr. Exh. 38.

### ii.  TDOC Practices

234.     The Department includes fourteen facilities spread out across the state.  The Department operates ten of those facilities and contracts out the administration of four facilities to a private company known as CoreCivic.  Trial Tr. Vol. 1, 32:3-17.

235.    A company called Centurion provides medical services for the ten facilities operated by the Department. Trial Tr. Vol. 1, 60: 5-8; 61 11-14.

236.    CoreCivic provides their own medical personnel at the four CoreCivic facilities. Trial Tr. Vol. 1, 60:9-14.

237.    When inmates enter the Department's custody they are processed at one of two facilities operated by the Department.  Male inmates are processed at the Bledsoe County Correctional Complex and female inmates are processed at the Tennessee Prison for Women in Nashville, Tennessee. Trial Tr. Vol. 1, 29:24-30:7.

238.    In the first 14 days after entering the system, inmates should receive a general health screening to identify acute or chronic diseases.  Trial Tr. vol. 1, 176:23-177:2.

239.    The opt-out screening for HCV at intake began in November 2018, more than two years after the lawsuit was filed in July 2016.  As a result, much of the current population has never been tested for HCV.  Trial Tr. Vol. 1, 201:18-19.

240.    Those inmates may not be tested until their next periodic health appraisal, which could be as long as 2-3 years away. Trial Tr. Vol. 2, 126:7-127:8l 128:19-21.

241.    Each facility has an onsite infirmary or clinic with medical staff.  Trial Tr. Vol. 1, 33: 14-18.

242.    Policies are to be applied across all facilities, regardless of whether the facility is managed by TDOC or CoreCivic.  Trial Tr. Vol. 1, 113:23-114:7.

243.    Medical providers at all facilities are required to follow the Department's policies and procedures.  Trial Tr. Vol. 1, 64:16-19.

244.    A recommendation from the TACHH is a directive that providers must follow. Trial Tr. Vol. 1, 135:8-10; 136:7-16.

245.     Inmates obtain access to the onsite infirmaries either by Chronic Care or by signing up for sick call.  Trial Tr. Vol. 1, 31:17-20.

246.     From time to time, inmates may be referred to outside medical services to receive treatment from a specialist.  Trial Tr. Vol. 1, 31:21-23; 33:4-7.

247.     The Department's Lois DeBerry Special Needs facility is primarily a medical facility for inmate care.  Trial Tr. Vol. 1, 33:2-5.

248.     Dr. Williams controls the transport of inmates in and out of DeBerry and permanent assignments to DeBerry for the purposes of specialty care. Trial Tr. Vol. 1, 33:7-13.

249.     Dr. Williams oversees CoreCivic and Centurion's compliance with the contract terms and policies and procedures. Trial Tr. Vol. 1, 60: 22 -25; 62: 4-19; 189:2-5.

250.     There is a large portion of the inmate population that has never been tested for HCV.  Trial Tr. Vol. 1, 115:19-25; 116:1-2.

251.     As much as thirty percent of the TDOC population could be infected with HCV. Trial Tr. vol. 1, 116:14-15.

252.     After TACHH considers a patient, the medical staff at the prison facility is supposed to follow TACHH's instructions for that patient, whether it be administering DAAs or conducting more testing or other follow up.  Stipulation, Dkt. 198, ¶¶ 15-16; Joint Tr. Exh. 40, p. 3 (Workflow).

253.     In practice providers have no guarantee as to when TACHH will consider a case after it has been submitted, or when TACHH will communicate its decision about treatment. Trial Tr. Vol. 1 130:4-16, 133:7-16; Trial Tr. vol. 1, 130:17-131:1, 133:17-19, 140:13-141:5; Deposition Designation of Dr. Dietz, Jan. 11, 2018, 58:9-59:5 (may not hear back from TACHH if they don't recommend treatment, may take a few months to hear anything if they do).

254. In practice, very few inmates have been approved for treatment with DAAs. In 2015, TACHH approved 3 inmates; 15 in 2016; 70 in 2017; 212 in 2018; and 127 so far in 2019.[1]  Joint Tr. Exh. 1-37; Pls' Tr. Exh. 46-49.

255. Of the individuals considered by TACHH from 2015-May 2019, 1 was treated in 2015; 7 were treated in 2016; 25 in 2017; 216 in 2018; and 101 have been treated so far in 2019. Joint Tr. Exh. 1-37; Plts' Tr. Exh. 21, 46-49, 50-54, 82, 84, 106.

## III. Class Definition and Remedy

256. Named Plaintiffs and Class members all have the Hepatitis C virus. Stipulation, Dkt. 219, ¶ 4.

257. At the time of trial, there were approximately 4,740 known Class members who had been diagnosed with Hepatitis C. Stipulation, Dkt. 198, ¶ 21.

258. Everyone with Chronic HCV requires treatment. Trial Tr. Vol. 1, 118:1-3; Trial Tr. Vol. 2, 27:2-5.

259. However, Defendants have treated very few inmates for HCV. As of March 15, 2017, 4,020 inmates had been diagnosed with HCV, but TACHH had approved treatment for only 17 of them. Plts' Tr. Exh. 34.

260. Even after learning more about the TACHH committee during trial, Parker has no interest in trying to learn more about what the Committee is, what it's doing, or how it operates. Trial Tr. Vol. 1, 91:25-92:20.

---

[1] The TACHH has approved some individuals more than once. For example: Inmate R.A. TDOC #378571 was approved on 9/20/17, and again on 5/2/18 (Joint Exh. 17; Joint Exh. 26); Inmate C.M. TDOC#413483 was approved on 1/30/29, 2/27/19, and again 4/24/19 (Joint Exhs. 34 and 35, and Pls.' Exh. 48); inmate E.H. TDOC# 100006 was approved four times (Joint Exhs. 33-36).  Therefore, these totals count each approved individual one time.

261. Universal treatment of Hepatitis C with DAA medications is the standard of care. Trial Tr. Vol. 2, 21:17-21; 121:16-21.

262. The Department is committed to ensuring that each inmate "receives their health care which is consistent with what is found in the community." Trial Tr. Vol. 1, 110:22-25. In other words, the Department's standard for medical treatment is to meet or exceed community standards of health for each inmate. Trial Tr. Vol. 1, 112:4-8.

263. Determining the fibrosis stage or F score of a patient is unnecessary because the standard of care is to treat all patients with chronic HCV. Trial Tr. Vol. 2, 26:21-27:5; 54:3-6; 122:7-13.

264. There is emerging evidence to support treatment with DAAs even during the acute phase of infection. Trial Tr. Vol. 2, 54:7-10.

265. The AASLD, IDSA, Centers for Disease Control, National Institutes of Health, the Veterans Health Administration, Medicare, several state Medicaid programs and private insurance companies all agree that the standard of care is to treat all chronic HCV infected individuals regardless of fibrosis score. Trial Tr. Vol. 2, 27:4-14.

266. The Federal Bureau of Prisons, the Center for Disease Control, the Veterans Administration and the Nation Health Institute all recommend treating patients with HCV at any fibrosis stage as soon as the disease progresses to the chronic stage. Trial Tr. Vol. 1, 145:16-25; 146: 1-25; 147:1-3.

267. The AASLD and the IDSA are professional societies that have produced guidance for practitioners which directs practitioners to treat everyone diagnosed with chronic HCV, regardless of their fibrosis score. Trial Tr. Vol. 2, 27:18-24.

268.     The vast majority of medical providers in the United States who treat hepatitis C follow the AASLD/IDSA guidance.  Trial Tr. Vol. 2, 101:12-14; 102:7-9.

269.     Dr. Koretz is unaware of any infectious disease practitioner who practices using any other standard. Trial Tr. Vol. 4, 90:19-91:11.

270.     Drs. Gerrity and Koretz are not infectious disease specialists and have never treated any patient with DAAs.  Trial Tr. Vol. 3, 219:4-7, 220:2-4; Vol. 4, 63:13-17, 65:8-10.

271.     Both the 2016 HCV Guidance and the 2019 HCV Guidance fall below the standard of care in the community.  Trial Tr. Vol. 2, 42:25-43:4.

272.     Neither Dr. Gerrity or Dr. Koretz give an opinion about the sufficiency of TDOC's HCV policies.  Trial Tr. Vol. 4, 81:2-5.

273.     Typically, it takes about two weeks after diagnosis with HCV to conduct the necessary testing to then begin treatment with DAAs.  Trial Tr. Vol. 2, 17:14-16.

274.     To proceed with treatment, it is necessary to determine the patient's genotype, liver function, and their liver fibrosis.  Trial Tr. Vol. 2, 14:5-7.

275.     Diagnosis of Hepatitis C starts with an antibody screening, which is a blood test. If the antibody is positive, that simply means the person was exposed to Hepatitis C.  Trial Tr. Vol. 2, 13:23-14:1; 14:8-10.

276.     Next, another blood test for HCV RNA is used to determine whether the HCV infection is active.  HCV RNA is the nucleotide of the virus, measured by PCR.  If the PCR is positive, that is an active infection.  Trial Tr. Vol. 2, 14:1-5; 14:8-10.

277.     Although testing to determine a patient's fibrosis stage was performed during the time of interferon-based regimens, it is no longer necessary and has no effect on a provider's decision to treat Hepatitis C.  Trial Tr. Vol. 2, 15:16-16:7.

278.    The Fib-4 score and the APRI index are non-invasive methods used to determine a patient's fibrosis stage.  Trial Tr. Vol. 2, 14:13-25.

279.    The Fib-4 score and APRI have high specificity but low sensitivity, meaning that they will fail to detect severe liver cirrhosis more than 50% of the time.  Trial Tr. Vol. 2, 14:25-15:8.

280.    The FibroScan is another, more accurate method of determining a patient's fibrosis stage.  Trial Tr. Vol. 2, 15:9-11.

281.    A patient's fibrosis stage can be measured using an "F score" on a scale from F0 (no fibrosis) to F4 (liver cirrhosis).  Trial Tr. Vol. 2, 26:9-19; Stipulation, Dkt. 198, ¶ 5.

282.    Only patients with chronic HCV have an F score; fibrosis is not measured in patients with acute HCV. Trial Tr. Vol. 2, 107:11-16.

283.    Once the patient is diagnosed with chronic HCV, genotype testing is used to determine whether the patient should be treated with an 8- or 12-week regimen of DAAs.  Trial Tr. Vol. 2, 16:15-23.

284.    The patient can be treated with an 8-week regimen of DAAs if they meet the following five criteria: genotype 1, treatment naive, viral load less than 6 million, no co-infection with Hepatitis B or HIV, and no cirrhosis.  Otherwise, a 12-week treatment regimen is required.  Trial Tr. Vol. 2, 16:18-17:6.

285.    If a patient is genotype 2 or 3, the provider can prescribe DAAs like Epclusa or Mavyret, which have pan-genotype sensitivity, meaning they can be used to treat all 6 genotypes.  Trial Tr. Vol. 2, 17:7-12.

286.    DAA treatment should normally begin within one month of an initial 15- to 20-minute appointment.  Trial Tr. Vol. 2, 17:17-18:2.

287. About 25-30% of patients with chronic HCV have a co-infection with Hepatitis B or HIV or both. Trial Tr. Vol. 2, 33:2-4.

288. When a patient has a co-infection, the viruses suppress each other, meaning that when one is suppressed, the other can be elevated or activated. Trial Tr. Vol. 2, 33:4-7.

289. In patients with co-infections, patients should first be treated with medications to suppress their HIV and/or Hepatitis B. Trial Tr. Vol. 2, 33:8-11.

290. There are no medications that can clear or cure HIV or the Hepatitis B virus, but medication can suppress them to undetectable levels. Trial Tr. Vol. 2, 34:5-9.

291. Usually, after about 1-2 months, HIV and Hepatitis B co-infections can be suppressed sufficiently and the patient can begin DAA treatment for their HCV. Trial Tr. Vol. 2, 34:10-22.

292. When an HCV+ person has a co-infection, the progression from hepatitis to liver cirrhosis to liver cancer is accelerated and can occur in less than 10 years. For this reason, co-infected individuals must be treated for the HCV as soon as possible. Trial Tr. Vol. 2, 33:11-22.

293. Before DAAs, treatment for HCV was interferon-based. Patients received either traditional interferon or interferon linked with PEG-C, which is called pegylated interferon, plus ribavirin. Trial Tr. Vol. 2, 18:13-19:1.

294. The success rate for interferon-based treatment was low. For people with genotype 1, which is the majority of those infected, the treatment had only a 50% success rate. For Genotype 2 and 3, the treatment success rate was 70%. Trial Tr. Vol. 2, 19:2-4; Stipulation, Dkt. 198, ¶ 8; Trial Tr. Vol. 1, 102:8-25; 103:1-4.

295. The interferon-based medication, including ribavirin, were also very toxic; People described it like chemotherapy. It caused severe side effects including depression, suicidal

ideation, hair loss, extreme fatigue, bone marrow suppression, drops in platelet count, white blood cell count and hemoglobin level.  Trial Tr. Vol. 2, 19:5-12; Stipulation, Dkt. 198, ¶ 8.

296.    The severe side effects associated with interferon-based treatment meant that there were often medical reasons not to treat some individuals with HCV.  Trial Vol. 2, 20:3-8.

297.    In addition to medical reasons not to treat, many patients would decide to forgo the "toxic" effects of the interferon-based treatment until their HCV symptoms worsened.  Trial Tr. Vol. 2, 20:8-11.

298.    Direct acting antiviral medications have very mild side effects.  Some patients report a little weakness or a light headache.  Others have difficulty sleeping.  Most patients have no side effects at all.  Trial Tr. Vol. 2, 20:12-19.

299.    There are now over 10 different DAA medications, some of which can treat all genotypes.  Trial Tr. Vol. 2, 21:7-16.

300.    The cure rate from DAA treatment is nearly 100%.  Trial Tr. Vol. 2, 19:23-20:2.

301.    Institutions that employ an early, universal treatment model can achieve 100% cure rate.  Trial Tr. Vol. 2, 20:1-2.

302.    Because there is not Hepatitis C vaccine, treatment with DAAs is the only form of prevention of disease transmission.  Trial Tr. Vol. 2, 28:20-25.

303.    Interferon-based regimes are no longer used by practitioners to treat HCV.  Trial Tr. Vol. 2, 21:24-25; 120:23-25.

304.    Although ribavirin is still sometimes used, it is only in combination with DAA treatment for patients that have cirrhosis. Trial Tr. Vol. 2, 30:10-20.

305.    Apart from DAA treatment, to which ribavirin is sometimes added, there is no other medication used to treat Hepatitis C.  Trial Tr. Vol. 2, 22:1-5; 23:6-9; 30:10-20; 113:15-20.

306. Monitoring a patient's hepatitis C is not treatment; monitoring has no effect on the progress of the disease. Trial Tr. Vol. 2, 24:8-14; 42:19-20.

307. Peer-to-peer education programs and other counseling programs do not constitute treatment. Trial Tr. Vol. 2, 24:8-11.

308. DAAs cure HCV by eliminating the HCV RNA from a patient's blood, thus achieving viral clearance or virologic cure. This is called Sustained Virologic Response ("SVR"). Trial Tr. Vol. 2, 22:6-23:5.

309. SVR is measured in 12 weeks after treatment is completed. Trial Tr. Vol. 2, 22:14-23; 89:12-90:2.

310. Reaching SVR prevents end stage liver disease, liver cancer, and death as a result of HCV. Trial Tr. Vol. 2, 87:11-25.

311. SVR is widely accepted as a reliable measure of the success of DAAs by the medical community, including practitioners and organizations like the Food and Drug Administration, the National Institutes of Health, the American Association for the Study of Liver Disease ("AASLD") and the Infectious Disease Society of America ("IDSA"). Trial Tr. Vol. 2, 88:3-9; 90:3-16; 113:2-3.

312. After a patient achieves SVR, the Hepatitis C virus should not reappear in body. Trial Tr. Vol. 2, 22:24-23:2; 23:4-5.

313. When a patient relapses, it is usually because they were not treated until they had high fibrosis or cirrhosis. Trial Tr. Vol. 2, 31:1-3.

314. Treating chronic HCV as soon as it is diagnosed prevents the progression from hepatitis to liver cirrhosis and prevents liver cancer. Trial Tr. Vol. 2, 28:11-13.

315.     Treatment of chronic HCV as soon as it is diagnosed can also stop or reverse extrahepatic manifestations such as vasculitis, liver-related kidney damage, insulin resistance, diabetes, depression, and cognitive problems.  Trial Tr. Vol. 2, 28:14-19.

316.     Hepatitis C is an infectious disease and its transmission is a public health concern. Early treatment of chronic HCV is important because it prevents transmission within the community.  Trial Tr. Vol. 2, 28:20-25.

317.     There is no medical reason not to treat patients as soon as they are diagnosed with chronic Hepatitis C.  Trial Tr. Vol. 2, 29:18-20; 47:18-25; 102:21-24.

318.     It costs more to treat patients who have progressed to liver cirrhosis or liver cancer than it does to treat patients upon diagnosis of chronic HCV.  Trial Tr. Vol. 2, 29:11-17.

319.     If a patient is not treated with DAAs until they have progressed to F3 or F4, the success rate is lower than if they had been treated with DAA medication earlier.  Trial Tr. Vol. 2, 30:10-14.

320.     For patients who have progressed to liver cirrhosis at the time they are treated, ribavirin is sometimes recommended in addition to DAA medication, which makes treatment more expensive.  Trial Tr. Vol. 2, 30:15-16; Dietz Dep., 46:1-6.

321.     If a patient is not treated until late in the progression of HCV, they will still be at a higher risk for liver cancers and other outcomes even if the treatment successfully cures them of HCV.  Trial Tr. Vol. 2, 31:4-7.

322.     This is because DAA medications cure the virus, which is the driving force behind liver disease progression.  But the damage to the liver is already done and cannot be reversed.  Trial Tr. Vol. 2, 31:8-12.

323.    Once a patient reaches F3, the damage to their liver is so significant that they require cancer screenings twice a year for the rest of their life, even after DAA treatment successfully cures their HCV.  Trial Tr. Vol. 2, 31:13-32:13; Yao Report, Dkt. 204-1, p.11.

324.    Although there are some factors that can accelerate the progression of liver disease, like co-infection or alcohol abuse, all patients have different rates of progression of fibrosis and physicians cannot accurately predict who will progress to cirrhosis or liver cancer or how long it might take.  Trial Tr. Vol. 2, 34:23-35:24; 111:2-8; Stipulation, Dkt. 198, ¶ 6.

325.    TDOC's report of the number of inmates with HCV is likely underestimated. Trial Tr. Vol. 2, 41:18-42:2.

326.    TDOC's current policy only recommends treatment for those with advanced liver disease, F3 and F4.  Trial Tr. vol. 2, 42:7-18.

327.    Not only does TDOC's written policy fall below the standard of care, TDOC's practice is even worse because there are instances where patients at F4 fibrosis stage are not treated (*e.g.*, Atkins, Spangler, Gooch) and patients with HBV coinfections are put on a waiting list (*e.g.*, Proffitt).  Trial Tr. Vol. 2, 42:25-43:4; Yao 2nd Supp. Report, Dkt. 235-1, p. 1; Trial Tr. Vol. 3, 231:1-24.

328.    The TACHH Committee referral system prohibits TDOC providers from making treatment decisions.  Trial Tr. Vol. 2, 44:5-11.

329.    A physician needs to meet face-to-face with patients in order to do a physical exam, evaluate their liver function, and symptoms.  Without this information, a physician cannot make an informed decision about treatment.  Trial Tr. Vol. 2, 44:19-24*;* 45:6-18.

330.    DAAs were approved by the Food and Drug Administration in 2011 for the treatment of HCV.  Trial Tr. Vol. 1, 102:12-15; Stipulation, Dkt. 198, ¶ 9.

331.     DAA treatment is very simple, requiring only one pill per day for an average of 12 weeks.  Trial Tr. Vol. 1, 102:22-25.

332.     The Department no longer uses interferon, even though the 2016 and 2019 Guidance reference it.  Trial Tr. Vol. 1, 138:6-12.

333.     TDOC's actual practices related to the treatment of HCV fall below the standard of care in the community.   Trial Tr. Vol. 2, 102:10-14.

334.     Neither Dr. Gerrity or Dr. Koretz give an opinion about the adequacy of TDOC's HCV diagnosis and treatment practices.  Trial Tr. Vol. 4, 81:2-5.

## CONCLUSIONS OF LAW

### I.     Deprivation of Constitutional Rights under Section 1983

1.     The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.   The Eighth Amendment "imposes duties on [prison] officials," including, among other things, the duty to "ensure that inmates receive adequate . . .  medical care . . . ."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Deprivation of medical care in prison is a form of "punishment" subject to Eighth Amendment review, *Estelle v. Gamble,* 429 U.S. 97, 104 (1976), and named Plaintiffs and Class members have been deprived of medical care for Hepatitis C in violation of the Eighth Amendment.

2.     By the Tennessee Department of Corrections' official policies and system-wide practices, Defendants have deprived Plaintiffs and Class members of a right secured by the U.S. Constitution, and federal law provides the remedy for that violation.  42 U.S.C. § 1983.

3.     Plaintiffs bring this case against Defendants Parker and Williams in their official capacities.  Defendants acted under color of state law in providing medical care to Plaintiffs and

Class members.  Dkt. 219, ¶ 4 ("The parties have stipulated that Defendants were acting under color of state law at all times relevant to this case[.]").

4.      Defendant Williams designed and implemented the Department's policies concerning Hepatitis C, including the May 2019 Guidance.  He also heads the TACHH, which makes individual treatment decisions for inmates.  As such, he is liable for the deprivations proven at trial.  *Young ex rel. Estate of Young v. Martin*, 51 F. App'x 509, 513-5 (6th Cir. 2002) ("Defendant [MDOC Director] Martin implemented a policy which only granted minimal care to inmates with chronic illnesses."); *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (defendant must have "directly participated in [the constitutional violation]" or "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.") (noting Caruso had "involvement in the administration" of the challenged program).

5.      Defendant Parker has ultimate authority for all of the Department's official health care policies.  He also has authority for budgetary requests for health care needs, and he demonstrated deliberate indifference in choosing not to seek adequate funding to the address the Department's Hepatitis C "epidemic."   As such, he is liable for the deprivations proven at trial. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978); *Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 743 (6th Cir. 2015) ("Because the decisions of President Hairsine represent SHP's official policy, moreover, a jury could find that her deliberate indifference is equivalent to SHP's deliberate indifference."); *Young ex rel. Estate of Young v. Martin*, 51 F. App'x 509, 513-15.

## II.      Eighth Amendment Violation

### a.   Class Members Suffer a Serious Medical Need

6.     In the context of medical care claims, an Eighth Amendment violation is shown by "deliberate indifference to serious medical needs of prisoners." *Estelle,* 429 U.S. at 104; *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  This standard encompasses both an objective element and a subjective element, and Plaintiffs have proven both in this case.

7.     Hepatitis C is a serious medical condition, and Class members suffer from serious medical need for treatment.  Dkt. 19, ¶ 4 ("The parties have stipulated that . . . Plaintiff and Plaintiffs' class have HCV which is a serious medical need[.]"); *see also Hix v. Tennessee Dep't of Corr.*, 196 F. App'x 350, 356 (6th Cir. 2006) ("[H]epatitis C likely constitutes a serious medical need sufficient to satisfy the objective component of our Eighth Amendment analysis[.]"); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017) ("Nor should it be surprising that this Court finds chronic HCV to be a serious medical need.").

8.     The need for treatment is obvious, and therefore objectively serious, *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896-98 (6th Cir. 2004), because Hepatitis C causes pain and other symptoms, hepatic degeneration, extra-hepatic complications, and ultimately death, *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) (stating that an "obvious need" is one that "expose[s the inmate] to undue suffering or the threat of tangible residual injury").

### b.  Defendants Are Deliberately Indifferent to that Need

9.     Once a serious medical need is found, a prison official becomes liable under the Eighth Amendment when he "knows of and disregards" that need.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010).

10.     "Defendants have knowledge of [Plaintiffs'] serious medical need."  Dkt. 19, ¶ 4.

11.     Defendants also disregarded that serious medical need.  "[I]t is enough for the prisoner to show that the official acted or failed to act despite his knowledge of a substantial risk

of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 436 (6th Cir. 2001) (quoting *Farmer* at 842). In this case, Defendants knew, at all times relevant, that more than 4,000 inmates had been diagnosed with Hepatitis C and that many were still undiagnosed in the prison system. Despite knowledge of the scope of the need, Defendants Williams and Parker chose not to request funding to treat Class members, but instead instituted a system of rationing DAA treatment through the TACHH.

12.     Defendants also knew of and ignored the substantial risk posed to Class members because of the severity of their need for treatment. Defendants knew that at least 109 inmates had died in the Department's custody from complications of the disease. Defendants knew that figure did not account for all individuals who died from the disease, such as Debbie Powell's son Michael. *See Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018) (describing proof of deliberate indifference "that each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it.") (citing *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

13.     Defendants base treatment decisions on cost and resources, rather than medical judgment or medical need. Indeed, TACHH is the exclusive source of treatment for Hepatitis C in the TDOC system, as Defendants have removed from treating physicians the ability to exercise independent medical judgment. *See Buffkin v. Hooks*, No. 1:18CV502, 2019 WL 1282785, at *9 (M.D.N.C. Mar. 20, 2019) (enjoining enforcement of Department's Hepatitis C policy because "that the policy might be construed to prohibit or prevent doctors from administering DAAs to any prisoner with HCV whose FibroSure score is below F2"); *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976) (distinguishing denials of medical care from exercise of independent medical judgment).

14.    Cost is never a permissible basis for denying care. "This is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial." *Bounds v. Smith*, 430 U.S. 817, 825 (1977); *see also Vick v. Core Civic*, No. 1:18-CV-00003, 2018 WL 2862861, at *9 (M.D. Tenn. June 11, 2018) (discussing "policies prioritizing cost-savings over inmates' medical treatment"); *Reeves v. Corr. Med. Servs.*, No. 08-13776, 2009 WL 3876292, at *7 (E.D. Mich. Nov. 17, 2009) (citing cases).

15.    The May 2019 policy cannot be said to embody an effective prioritization system for the treatment of Hepatitis C because Class members have no guarantee of being treated once they arrive at a priority level of fibrosis. In fact, even at priority levels, whether a Class member receives treatment is wholly a function of resource availability. *See Stafford v. Carter*, No. 117CV00289JMSMJD, 2018 WL 4361639, at *15 (S.D. Ind. Sept. 13, 2018) (noting that "not even all of those inmates designated as 'high priority' for treatment have received it").

16.    The May 2019 policy also cannot be said to embody an effective prioritization system for the treatment of Hepatitis C because Defendants fail to take adequate measures to diagnose unknown Class members or even to stage known Class members by fibrosis score. For example, some inmates with chronic Hepatitis C have not been enrolled in the chronic care clinic. Some receive such sporadic periodic monitoring that they progress to advanced fibrosis stages before receiving treatment. Others seem to fall between the cracks, never getting on the TACHH agenda or never receiving the follow up ordered by TACHH. *See Hoffer v. Inch*, 382 F.

Supp. 3d 1288, 1295 (N.D. Fla. 2019) (finding that "not adequately monitoring all inmates with cHCV" supports "this Court's finding of deliberate indifference.").

17.     Defendants have identified hundreds of Class members who fall into the priority categories in the May 2019 Guidance, concede that those individuals face a substantial risk of adverse outcomes including end stage liver disease and death, but continue to adhere to a policy that caps treatment of those individuals at a maximum number per month, while simultaneously ignoring the needs of those who are not lucky enough to get in under the cap.  This is the very definition deliberate indifference.  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

18.     Monitoring and patient education, as embodied in the recent peer-to-peer policy, are not forms of treatment.  *Stafford v. Carter*, No. 117CV00289JMSMJD, 2018 WL 4361639, at *16 (S.D. Ind. Sept. 13, 2018) ("On the other hand, Plaintiffs have presented undisputed medical evidence (in the form of expert testimony) that blood draws, monitoring, and patient education do not constitute effective treatment.").  Providing monitoring and education while denying DAA treatment is constitutionally inadequate.  *See Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 744 (6th Cir. 2015) ("Grossly inadequate medical care may establish deliberate indifference."); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (finding that "ignore[ing] a condition of confinement that is sure or very likely to cause serious illness or needless suffering in the next week or month or year" to be deliberate indifference).

### c.  Defendants' Policies and Practices Cause the Plaintiffs Harm

19.     Defendants have caused Class members' constitutional deprivations because their "policies are the moving force behind the constitutional violation." *Gray v. City of Detroit,* 399 F.3d 612, 617 (6th Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378 (1989)). *Hoffer*,

2019 WL 1747074, at *3 ("As such, because Plaintiffs' claim is based on inadequacies in [the Department's] policy and the implementation of that policy, the causation element is satisfied.").

20.     In fact, Defendants' policies appear to be the sole cause of the deprivation of medical care Class members suffer.  While the May 2019 policy is titled "guidance," medical providers are expected to follow it and, in fact, do follow it without deviation in practice. Medical providers have little choice in the matter, because DAAs are non-formulary in the TDOC system and providers cannot prescribe these medications without approval from Dr. Williams.  Because medical providers in the prisons cannot exercise their own medical judgment as to HCV treatment, Defendants cannot shift responsibility for the lack of care to them. *See Stafford*, 2018 WL 4361639, at *15 ("[O]therwise physicians would be left to simply apply their own medical judgment as to the proper course of treatment for each inmate.").

### III.    Class Definition and Remedy

21.     Because Plaintiffs and Class members have been deprived of medical care as the result of Defendants' system-wide policies and practices that apply to Named Plaintiffs and the Class as a whole, class-wide injunctive relief is appropriate. *Sharpe v. Cureton*, 319 F.3d 259, 268–69 (6th Cir. 2003) (discussing class-wide remedies); *Farmer* at 846 ("If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief.").

22.     "[T]o establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." Farmer at 846. In other words, the evidence at trial must demonstrate "a contemporary violation of a nature likely to continue." *Farmer* at 845 (quoting *United States v. Oregon State Medical Soc*., 343 U.S. 326, 333 (1952)); *Hoffer*, 2019 WL 1747074, at *2 (finding injunctive relief

appropriate where "'there is a real and immediate threat of repeated injury in the future"). In this case, the stark nature of Defendants' past deprivations of care cannot be ignored. For many years, Defendants treated only a handful of inmates with DAAs, despite recognizing the virus as a "silent epidemic" in the TDOC system. While Defendants began to treat more Class members with DAAs as the trial approached and updated the HCV Guidance two months before trial, those improvements do not cure the constitutional violation. Defendants continue to treat Hepatitis C exclusively through TACHH, which reviews a limited number of cases per month. Indeed, recognizing the magnitude of the problem, Defendants could sit down with their infectious disease consultant, Dr. Dewsnup, and simply go through the multiple spreadsheets listing individual Class members and prescribe the appropriate DAA for each, thereby taking a huge stride in resolving the problem in a matter of days. They simply choose not to do that. Because Defendants have chosen to simply put a band-aid on the problem, rather than resolving it, injunctive relief is appropriate.

23.     Class members' individual medical issues do not prevent the Court from fashioning class-wide, injunctive relief. Indeed, "[w]hat matters . . . is not the raising of common questions, but the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dodson v. CoreCivic*, No. 3:17-CV-00048, 2018 WL 4776081, at *3 (M.D. Tenn. Oct. 3, 2018) (emphasis in original) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)). In this case, the Court should enjoin Defendants to treat all Class members with chronic Hepatitis C, which affirmative relief will cure Defendants' constitutional violations across the entire TDOC system and will resolve the litigation in whole.

24.     In this case, injunctive relief will resolve the constitutional deprivations suffered by the Class as a whole defined as follows (Dkt. 32):

All persons currently incarcerated in any facility under the supervision or control of the Tennessee Department of Corrections or persons incarcerated in a public or privately owned facility for whom the Tennessee Department of Corrections has ultimate responsibility for their medical care and who have at least 90 days or more remaining to serve on their sentences and are either currently diagnosed with *chronic* Hepatitis C infection or are determined to have *chronic* Hepatitis C after a screening test has been administered by the Department of Corrections.[2]

25.    The Class meets all requirements of Fed. R. Civ. P. 23(a) and 23(b)(1) and (2). Dkt. 32 and 33.  Additionally, the class definition is sufficiently definite to be ascertainable.  *See Young v. Nationwide Ins. Co.*, 693 F.3d 532 (6th Cir. 2012); *but see Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016) (holding that ascertainability is a question to be resolved after certification for injunction-only cases).  In fact, Defendants have already identified approximately 4,800 Class members with chronic Hepatitis C, and the identities of the remaining Class members are ascertainable through administration of basic blood tests of the previously untested population.

26.    The Court affirmatively enjoins Defendants to take the following actions: (1) identify all individuals in the TDOC system with Hepatitis C and commence DAA treatment of all Class members with chronic Hepatitis C within one month of the entry of judgment; (2) on a going-forward basis subsequent to the entry of judgment, perform opt-out testing for individuals entering the TDOC system and commence DAA treatment for all those individuals identified as having chronic Hepatitis C within one month of diagnosis; (3) appoint a monitor to ensure compliance with the Court's order; and (4) order that Defendants pay Plaintiffs attorneys' fees and costs of litigation.

---

[2] Based on the evidence presented at trial, Plaintiffs acknowledge that Class as defined by the Court, Dkt. 32, may appropriately be revised to include only those with chronic Hepatitis C, as opposed to those with both chronic and acute Hepatitis C.

Dated: August 19, 2019

Respectfully submitted,

/s/ Karla M. Campbell
James G. Stranch, III (BPR 2542)
Karla M. Campbell (BPR 27132)
Callie K. Jennings (BPR 35198)
BRANSTETTER, STRANCH
   & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
karlac@bsjfirm.com


Thomas H. Castelli (BPR 24849)
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF TENESEEE
P.O. Box 120160
Nashville, Tennessee 37212
Phone:  (615) 320-7142
Fax:  (615) 691-7219
tcastelli@aclu-tn.org

Stacie L. Price (BPR 030625)
Sherry A. Wilds (BPR 021756)
DISABILITY RIGHTS TENNESSEE
2 International Plaza, Suite 825
Nashville, Tennessee 37217
Phone: (615) 298-1080
staciep@disabilityrightstn.org
sherryw@disabilityrightstn.org

## CERTIFICATE OF SERVICE

I certify that on August 19, 2019, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and served via the Court's Electronic Filing System to:

Pamela S. Lorch
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202-0207

Steve Hart
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202-0207

Jim Newsom
Matthew Dowty
Tennessee Attorney General's Office
40 South Main Street, Suite 1014
Memphis, TN  38103-1877

*Attorneys for Defendants*

/s/ Karla M. Campbell
Karla M. Campbell
